274 S.W.3d 619 (2009)
In re the ADOPTION OF N.L.B., Plaintiff,
M.T. and S.T., Respondents,
v.
C.L., Appellant.
No. WD 70177.
Missouri Court of Appeals, Western District.
January 27, 2009.
*620 Robert Edward Arnold, Olathe, KS, for Appellant.
Cheri Cole Simpkins, Independence, MO., for Respondent.
Before: VICTOR C. HOWARD, Presiding Judge, JOSEPH M. ELLIS, Judge and ALOK AHUJA, Judge.
JOSEPH M. ELLIS, Judge.
This case is a tragic reminder of how difficult it is to balance the best interests of a prospective adoptive child and the rights of a natural parent who opposes termination of his or her parental rights. N.L.B. was born on December 12, 2004, and is now four years old. This termination/adoption case was initially filed in February 2005, a judgment granting adoption was entered after trial on October 19, 2005, and that judgment was appealed to the Supreme Court of Missouri. The Supreme Court handed down its decision on January 7, 2007, reversing the judgment of the trial court and remanding the case for further proceedings. In re Adoption of N.L.B. v. Lentz, 212 S.W.3d 123, 123 (Mo. banc 2007). On remand, after trial over the course of seven days in the fall of 2007, the trial court entered a judgment on December 28, 2007, adopting and confirming the findings and recommendations of the Commissioner terminating the parental of rights of C.L. ("Father") and once again approving the adoption of his son, N.L.B. From that judgment, Father has perfected this appeal.
The underlying facts of this case, as set forth previously by our Supreme Court, are as follows:
The adoptive child was born on December 12, 2004, in Cape Girardeau, Missouri. Father traveled from his home in Columbia to be present at the hospital, he participated in the birth of the child, and he stayed with mother and child until their release. However, only the mother's name was entered on the birth certificate; the father's name was entered as "unknown." On release from the hospital, mother placed the child in foster care for the purpose of adoption in Cape Girardeau, and father returned to Columbia. Then, on January 20, 2005, father, who had driven back to Cape Girardeau, and mother signed a "Reconsideration of Adoption Plan by Birth Parents" (although appellant wrote "not the father" after his signature), and they withdrew the child from foster care. Father and mother each paid half of the $300 cost of foster care. On that same day, father drove mother and child to Kansas City and placed the child in the home of another couple who were acquaintances of father. Although this placement was also made for the purpose of adoption, mother was given access to the child, and in the meantime, father returned to Columbia, though he remained in continual contact with the mother.

*621 On February 15, 2005, M.T. and S.T., another couple with whom the child had been placed, filed a petition for transfer of custody and adoption of the minor child. At a hearing on February 25, the mother consented to the adoption and the court transferred custody to the petitioners. The petition stated that the father was "unknown;" father was never served with process. However, the night before, on February 24, father and mother had visited with the child, and the trial court found that father had actual notice of the hearing held the next day. Nonetheless, he did not attend.
On March 2, less than a week after the hearing, father now well aware that adoption proceedings had commenced, filed with the putative father registry pursuant to section 210.823, and mother signed the documents as well confirming that [C.L.] was the father. At approximately that same time, father and mother both signed a separate "acknowledgment of paternity form" pursuant to section 193.215. On March 4, an amended birth certificate was issued listing [C.L.] as the father. Then, on March 24, father sought leave to intervene in the adoption proceeding. Leave was granted on March 28. Father filed an answer on April 28 objecting to the adoption and to the termination of his parental rights. In the answer, he alleged that he was the natural father as conclusively shown by DNA testing, but stated he had not had sexual intercourse with mother in a manner that would have led to conception. On June 17, father next filed a separate "Petition of Declaration of Paternity." In response to these actions, M.T. and S.T. filed a second amended petition on June 23 expressly alleging that "the minor child was born out of wedlock to [mother] and [C.L.]" and that "the identity of the natural father is [C.L.]."
The trial was conducted on September 29 by a family court commissioner. The presentation of evidence was generally restricted to the issue of father's failure to file an action for paternity or file with the putative father registry within 15 days of the child's birth, which would obviate the need for his consent to the adoption under section 453.030.3. Although his actual paternity was not contested, father testified that his initial hesitancy in claiming paternity was due to his belief that his sexual relations with the mother could not have resulted in conception  that although he ejaculated, there was not sufficient penetration. He added that he now realized that there was sufficient penetration and conception did occur. Mother testified to the same effect, and added that she had had no sexual relation with any other person than father. At the conclusion of the trial, the commissioner entered findings and recommendations in favor of petitioners that were then incorporated in the judgment of adoption entered by the court.
In re Adoption of N.L.B., 212 S.W.3d at 124-25.
The Supreme Court subsequently reversed the trial court's decision, holding that "[t]he adoption statutes, properly interpreted.. . tacitly allow an unwed father in father's position to contest the adoption by presenting evidence of his parental fitness despite the fact that he did not fall within one of the three categories of fathers under section 453.030.3(2) from whom consent to an adoption must be given." Id. at 127. The court determined that the trial court had, therefore, erred in limiting the evidence presented at trial and "should instead have permitted all evidence pertaining to the ultimate and overriding *622 ground for adoption required in section 453.030  `the welfare of the person sought to be adopted.'" Id. at 128.
On remand, the circuit court granted Respondents leave to file a third amended petition on March 7, 2007. The case was eventually heard in seven days interspersed between September 14 and November 21, 2007. The court noted that the case had been remanded from the Supreme Court "with direction to the trial court to determine the `unfitness' of [Father] in addition to the lack of statutory requirements of Section 453.030 RSMo." On December 28, 2007, the circuit court issued its judgment terminating Father's parental rights and approving the adoption of N.L.B. by M.T. and S.T. In so doing, the court found that Father had "willfully, substantially and continuously failed and neglected to provide the child with necessary care and protection" during the six months immediately preceding the filing of the petition. Father appeals.
"In adoption cases, as in other court-tried cases, the judgment will be sustained unless it is not supported by substantial evidence, it is against the weight of the evidence, or the trial court erroneously declares or applies the law." In re K.R.J.B., 228 S.W.3d 611, 613 (Mo.App. S.D.2007). In making that determination, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the trial court's decision and disregard all evidence and inferences to the contrary. In re Adoption of T.J.D., 186 S.W.3d 488, 490 (Mo.App. S.D.2006). "Moreover, we are mindful that a trial court is free to believe or disbelieve all, part or none of the testimony of any witness." Id. (internal quotation omitted).
Father brings eight points on this appeal. Because of the way the issues are raised and our disposition of them, they will be addressed out of order. Nonetheless, we begin with his first point, in which Father claims that the trial court erred in concluding that his consent was not required for the adoption. Father argues that such consent was required under § 453.030, provided none of the exceptions listed in § 453.040 applied, because the Missouri Supreme Court had found his paternity had been established.
In its opinion, the Missouri Supreme Court acknowledged that Father and Mother "had signed an `acknowledgment of paternity' form pursuant to section 193.215 which, under section 210.823, `shall be considered a legal finding of paternity. ...'" In re Adoption of N.L.B., 212 S.W.3d at 128. The court held that Father had standing to intervene in the adoption proceedings based on this acknowledgement of his paternity, as well as the fact that his paternity was essentially conceded by Respondents, and the fact that he had never consented to the termination of his parental rights or to the adoption of the child. Id. The Supreme Court held that the trial court erred in failing to allow Father to challenge the adoption despite the fact that he did not fall within any of the categories of putative fathers from whom written consent to adopt was required under § 453.030. Id. The Court noted that the adoption statutes "tacitly allow an unwed father in father's position to contest the adoption by presenting evidence of his parental fitness despite the fact that he did not fall within one of the three categories of father under section 453.030.3(2) from whom consent to an adoption must be given." Id. at 127. The Court further stated:
[T]he fact that consent from those fathers need not be obtained does not necessarily mean that they are deemed to have consented to the adoption. Nothing in the statute precludes these putative fathers from otherwise timely *623 challenging the adoption and termination of their parental rights incident to the adoption, and the fact that they are not required to give consent to the adoption because they failed to file an action for paternity or to file with the putative father registry is but one factor to be considered as part of the challenge.
Id.
Thus, while the Supreme Court's opinion allows Father to contest the adoption, it does not stand for the proposition that, under the circumstances of this case, his consent is required under § 453.030. Point denied.
We next consider Father's constitutional claims. In his fourth point, Father contends that his constitutional right to due process was violated when the trial court allowed Respondents to file their third amended petition because his consent to the adoption was required under the law. In the alternative, in his eighth point, Father argues that his constitutional rights were violated if his consent was not required under the law. As noted supra, the Missouri Supreme Court already determined that Father's consent was not required under the applicable statutes and that his constitutional rights were not violated by the statutory scheme in place for adoptions because the statutory scheme afforded Father the opportunity to challenge the adoption and to be heard on the issue of parental fitness. In re Adoption of N.L.B., 212 S.W.3d at 127. Points denied.
In his second point, Father challenges the sufficiency of the evidence to support the trial court's finding that Father fell under the abandonment and neglect exception to consent contained in § 453.040(7). We need not consider this argument because the trial court's finding was entirely gratuitous in light of the Supreme Court's holding that Father did not fall within one of the categories of putative fathers from whom consent was required. Point denied.
In his third point, Father claims that the trial court's termination of his parental rights under § 211.447.5(2)(d) was not supported by the evidence and was against the weight of the evidence.[1] Section 211.447.5(2) provides that parental rights may be terminated where the child has been abused or neglected. The statutory language further provides:
In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to *624 consistently provide such care, custody and control;
(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts are being committed toward the child or any child in the family; or
(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development[.]
The uncontroverted evidence reflects that Father was present at the child's birth, provided some transportation to Mother and the child, and paid half of the $300.00 needed to cover the expenses of the first foster care placement. After the child was placed with Respondents, Father was precluded from any contact with the child. Subsequently, Father sent occasional gifts to the child and, on September 21, 2005, Father sent a check denominated "child support" to Respondents in the amount of $1,025.00. After the trial court entered its Judgment of Adoption on October 19, 2005, Father did not pay any further child support to Respondents until after the Missouri Supreme Court's opinion became final on February 14, 2007. On March 3, 2007, Father renewed payment of child support and sent his first check to Respondents in the amount of $450. Subsequently, Father made similar child support payments for each month up until the time of the second trial.
On March 7, 2007, Respondents filed a motion for leave to file a Third Amended Petition for Adoption, in which they added allegations that Father had neglected the child by failing to pay child support over the preceding six months, the period in which the case was pending before the Missouri Supreme Court. On March 12, 2007, Respondents accepted and received the certified letter containing the support check sent by Father on March 3. On March 13, 2007, the Family Court Commissioner granted Respondents' motion to file an amended petition.[2]
Ultimately, in its judgment, the trial court concluded that Father had intentionally failed to support the child from birth until March 2007 and that Father's parental rights could and should be terminated under § 211.447.5. In making that determination, the trial court found that the check that Father sent to Respondents in the amount of $1,025.00 on September 21, 2005, which was denominated child support, was "irrelevant and a token payment"[3] and that Father should have paid child support while his appeal was pending before the Missouri Supreme Court. The trial court did not make findings on the other factors contained in § 211.447.5(2).
To the extent the trial court attempted to rely on facts prior to the previous trial to establish abuse or neglect, our Supreme Court already determined that the evidence did not support a finding of abandonment or substantial and continuous neglect *625 under § 453.040(7)[4] prior to the first trial. The Missouri Supreme Court held that the evidence presented at the first trial did not support a finding that any of the grounds contained in § 453.040 had been established:
It is quite unclear from the face of the court's finding to which of the three grounds for abandonment [contained in § 453.040(7) ] the court is attempting to refer. In any event, the court's express finding that father willfully abandoned the child for a period of at least six months immediately prior to the filing of the second amended petition is not supported by the evidence. The second amended petition was filed on June 23, but father had filed his motion to intervene in the case three months before on March 25, and since that time has actively contested the adoption at every step of the proceedings. Moreover, the court placed the child for adoption on February 25 (again less than six months before the filing of the second amended petition), and since that time father was precluded from any contact with the child. Under these circumstances, father cannot be said to have abandoned the child.
Even if the trial court's finding had referred to abandonment for a 60-day period prior to the filing of the petition for adoption, rather than abandonment for a six-month period prior to the filing of the second amended petition, the evidence was still insufficient. The original petition was filed on February 15, only 65 days after the birth of the child. The uncontroverted evidence was that father was present for the birth of the child, that mother placed the child in foster care, that father and mother recovered the child from foster care on January 20 and each paid half of the $300 for the cost of the foster care, and that the same date father transported the mother and child to Kansas City for a different foster care placement. The statutory requirement to prove abandonment "for a period of at least sixty days," implies abandonment for a continuous period of sixty days, and father's conduct in caring for the child on January 20 alone refutes the allegation. Even assuming that the placement of the child with father's acquaintances in Kansas City constituted an abandonment, the period of abandonment "immediately prior to the filing of the petition" ran only from January 20 to February 15, a mere 26 days, rather than the requisite 60 days.
In re Adoption of N.L.B., 212 S.W.3d at 128-29 (internal citations omitted).
Since the only evidence in the second trial pertaining to neglect as contemplated in § 211.447.5(2) that occurred prior to the first trial was the same evidence as was presented in that first trial on the issue of abandonment or neglect under § 473.040(7), and the Supreme Court found that evidence insufficient under the latter statute, it was likewise insufficient to establish abuse or neglect under § 211.447.5(2). Accordingly, the trial court's findings to that effect are clearly erroneous as they are contrary to the prior holding of the Missouri Supreme Court. Williams v. Kimes, 25 S.W.3d 150, 153-54 *626 (Mo. banc 2000) ("A previous holding is the law of the case, precluding re-litigation of issues on remand and subsequent appeal."); Shahan v. Shahan, 988 S.W.2d 529, 533 (Mo. banc 1999) ("The general rule is that the decision of a court is the law of the case for all points presented and decided, as well as for matters that arose prior to the first adjudication and might have been raised but were not. The court's decision remains the law of the case throughout all subsequent proceedings, both in the trial and appellate courts.") (internal citation omitted); Mo. Const. art. V, § 2 (1945) (Missouri Supreme Court "decisions shall be controlling in all other courts."); Custer v. Hartford Ins. Co., 174 S.W.3d 602, 609 (Mo.App. W.D.2005) (quoting Kinder v. Missouri Dep't of Corr., 43 S.W.3d 369, 374 (Mo.App. W.D.2001)) ("`This court is constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court.'").
The trial court's factual finding that Father had "not pursued contact or requested visitation with the minor child until July 2007" is not supported by the record in any manner. As noted in the Supreme Court's opinion, after the trial court placed the child for adoption on February 25, 2005, Father was precluded from any further contact with the child. In re Adoption of N.L.B., 212 S.W.3d at 129. After the Supreme Court's opinion was handed down, Father sent Respondents several notes with his support checks, starting with the first check he sent on March 3, 2007, pleading with them to allow him to see the child and to return his phone calls. Those notes were admitted into evidence at trial, and Respondents admitted having received them. Moreover, on March 7, 2007, shortly after the Supreme Court's decision became final, Father filed a Third Party Petition seeking a transfer of custody and also transitional visitation. The trial court's finding is clearly erroneous as there is nothing whatsoever in the record to support it.
The trial court also inexplicably found that Father's testimony "that he does not now consent to the child being placed for adoption" was not credible, despite his pleadings and continued opposition to the petition for adoption and pursuit of custody for himself. That finding is also clearly devoid of any support in the record.
Thus, we are left with the issue of whether the evidence that Father failed to pay child support while he appealed the trial court's first judgment supported the trial court's finding that Father sufficiently neglected the child to warrant the consideration of termination of his parental rights under § 211.447.5(2). Regardless of whether Father had an obligation to pay child support while he was appealing the trial court's first judgment, under the circumstances herein presented, he simply cannot be deemed to have abused or neglected the child as provided in § 211.447.5(2) where he was actively fighting to regain the right and duty to provide care for his child. Indeed, "failure to provide support alone has not been held to warrant termination of parental rights." In re Adoption of B.D.W., 185 S.W.3d 727, 738 (Mo.App. S.D.2006). Furthermore, Father resumed paying child support on March 3, 2007, shortly after the Supreme Court's decision became final and prior to the filing of Respondent's Third Amended Petition, and he continued to make child support payments through the date of trial. Father also obtained and maintained health insurance for the child after the Supreme Court's opinion came down and took advantage of the supervised visitation eventually allowed him by the trial court in July 2007. Father's actions subsequent to the entry of the first judgment simply do not rise to the level of neglect that would *627 warrant termination of parental rights under § 211.447.5(2).
Accordingly, the trial court's decision that termination of Father's parental rights was proper under the abuse and neglect provision of § 211.447.5(2) is not supported by the record and is against the weight of the evidence. The trial court's judgment to the contrary must be reversed. Point granted.
Since we have granted Father's third point, we need not address his sixth and seventh points. In his fifth point, Father contends that the trial court erred in making an alternative finding that extraordinary and unusual circumstances existed in this case that, in the event adoption was not proper, warranted granting Respondents guardianship over the child. Father argues that this finding is not supported by the evidence and is against the weight of the evidence.
In In re Hill, 937 S.W.2d 384 (Mo.App. W.D.1997), Antonio C. Garrett appealed the trial court's placement of his minor son, born out of wedlock, in the custody of the mother's brother and sister-in-law, Albert and Betty Hill, under the supervision of the Division of Family Services ("DFS"). Id. at 385. The child, Julian, was born September 5, 1991. Id. Mother left Julian with the Hills in November 1991, and the juvenile court, upon a petition filed by the Juvenile Officer, subsequently awarded them custody under DFS supervision. Id. In November 1993, after DFS identified Garrett as the potential father, blood tests were performed and confirmed that he was in fact the father. Id. at 386. In April 1995, the court reviewed the matter again and continued the same custodial arrangement, but it granted Garrett weekly visitation and ordered him to pay child support beginning May 1, 1995. Id.
On September 22, 1995, when the child was three years old and had been in the continuous custody of the Hills since November 1991, the court, after another hearing, ordered that the Hills retain custody, finding that special or extraordinary reasons required that placement. Garrett appealed. Id.
This court affirmed the juvenile court's decision. Id. at 385. In our analysis, we recognized that "a parent's right to the custody of his or her child is controlling when it is consistent with the child's welfare, and presumptions do favor a parent's having custody of his or her child." Id. at 386. "Those presumptions are rebutted, however, when special and extraordinary reasons mandate that custody be granted to someone other than the parent for the child's well-being, regardless of whether or not the evidence establishes the unfitness of the natural parent." Id. This court found that substantial evidence supported the lower court's finding. Id. at 387. We noted, inter alia, that experts testified that Julian had bonded strongly with the Hills and warned that removing him would be traumatic for the child. Id. at 387. There was also expert testimony that Garrett had not bonded with the child, that he indicated more concern for his rights than for Julian's welfare, and that he "did not have a good understanding of child development and was unable to empathize with Julian's emotions and needs." Id.
Ultimately, however, we emphasized that this was not a permanent placement. Id. at 386. We pointed out that DFS continued "to work with Garrett to unite him with his son," that he continued to have visitation rights, and that his parental rights had not been terminated. Id. We went on to state:
[Garrett] may petition the court at any time to modify or to terminate the custody order. ... This simply is not a case of *628 the state's breaking the bonds of parent and child.
* * *
Unlike a termination order, a custody order is not irreversible and is subject to modification and termination.
Id. at 388.
In the case sub judice, the trial court noted that the guardian ad litem had suggested that extraordinary and unusual circumstances existed in this case that might warrant an alternative award of custody to Respondents, citing Hill. But the trial court did not make any findings as to extraordinary or unusual circumstances and did not make an alternative award of custody to Respondents. Thus, Father's complaint is unfounded. Point denied.
As noted at the outset, the tragedy of this case is that, because of the prolonged litigation, the child is now four years old. He has had limited visitation with Father during that four years. Nevertheless, under the statutory scheme adopted by our legislature and the constitutional rights that are implicated, Father's parental rights cannot, nor should they, be terminated based on how long litigation regarding them can be or is prolonged.
For the reasons stated herein, the judgment of the trial court is reversed.[5] However, the trial court presumably chose not to make findings or conclusions on the issue of extraordinary or unusual circumstances because it was entering the permanent order of termination and adoption. Therefore, we remand the case to the trial court to consider whether extraordinary or unusual circumstances exist such that the well being of the child might require an award of custody to Respondents, or some other individual or agency, for such duration and upon such conditions as the court may deem appropriate.[6]
All concur.
NOTES
[1] Apparently in response to the Supreme Court's statement that Father was entitled to "a hearing on parental fitness," NLB, 212 S.W.3d at 127, Respondents amended their petition on remand to assert that Father was guilty of neglect, and the trial court authorized the adoption and consequent termination of Father's parental rights on the basis of a finding of neglect under § 211.447.5(2)(d). The parties' arguments on appeal assume that the trial court's judgment can be affirmed only if this neglect finding is upheld, and we proceed accordingly.
[2] Curiously, the Family Court Commissioner not only granted Respondents' Motion for leave to file the amended petition, but also ordered that the amended petition be filed stamped as having been filed on March 7, 2007.
[3] The trial court likewise found that the total of $4,142.95 that Father had provided in gifts and child support up to the date of trial was "token at best."
[4] Under that section, "[t]he consent to the adoption of a child is not required of .. . [a] parent who has for a period of at least six months, for a child one year of age or older, or at least sixty days, for a child under one year of age, immediately prior to the filing of the petition for adoption, willfully abandoned the child or, for a period of at least six months immediately prior to the filing of the petition for adoption, willfully, substantially and continuously neglected to provide him with necessary care and protection." § 453.040(7).
[5] Respondents' motion to dismiss for violation of the rules of appellate procedure, which was taken with the case, is overruled.
[6] In deciding this issue, the trial court should be mindful that Missouri cases have consistently declared that the conduct of the third party custodians in limiting the biological parent's contact with the child serves to diminish, if not exclude, the possibility of prolonged custody being a basis for a finding of extraordinary or special circumstances. See Flathers v. Flathers, 948 S.W.2d 463, 470-71 (Mo.App. W.D. 1997) ("The trial court did not find nor does the evidence demonstrate that the appellants originally conspired or connived to gain temporary custody of the children to enable them to `set-up' the special or extraordinary circumstance argument. ..."); Scott v. Scott, 147 S.W.3d 887, 896 (Mo.App. W.D.2004) ("Hence, our appellate courts have recognized that the welfare of a child might require that he or she remain in the custody of a third party, rather than be returned to the custody of his or her biological parent, assuming the third party did not conspire to limit the biological parent's contact with the child."); Jones v. Jones, 10 S.W.3d 528, 539 (Mo.App. W.D. 1999) ("In finding that the evidence was sufficient to rebut the parental presumption of the father, we would note that the outcome may have been different if the record supported a finding that the grandmother conspired to keep the father in the dark about the mother's absence from the home and her non-existent role in raising Caleb to allow his long-term bonding with her so as to cut off the parental presumption in favor of the father.").