In the Interest of: C.L., Appellant,

v.

M.T., S.T., and N.L.B., Respondents.

No. WD 71971.

Missouri Court of Appeals, Western District.

Feb. 1, 2011.

Robert E. Arnold, III, Olathe, KS, Cynthia K. Wallace, Kansas City, MO, for Appellant.

Cheri C. Simpkins, Independence, MO, for Respondents, M.T. and S.T.

Laurie V. Snell, Kansas City, MO, for Respondent, N.L.B.

JAMES EDWARD WELSH, Judge.

C.L. appeals the circuit court's judgment granting guardianship of C.L.'s son, N.L.B., to unrelated third parties, M.T. and S.T. C.L. contends that the circuit court erroneously applied the law in regard to whether extraordinary and unusual circumstances existed such that the well being of the child required that guardianship of the child be placed with M.T. and S.T. C.L. also contends that the circuit court's findings and conclusions that extraordinary and unusual circumstances existed were against the weight of the evidence. Further, C.L. complains that the circuit court erred in denying his request for fees and costs, in calculating child support at $641 per month, and in allowing the child's name to be changed. We affirm in part and reverse and remand in part.

## FACTUAL BACKGROUND

The parties in this case and the courts of this State have been struggling with the fate of this child for almost six years. N.L.B. was born on December 12, 2004, and is now six years old. The circuit court has attempted to terminate C.L.'s parental rights on two different occasions and has attempted to allow M.T. and S.T. to adopt N.L.B., but the Missouri Supreme Court and this court have reversed those determinations. Now, the circuit court is ordering that it is in the best interest of the child for M.T. and S.T. to receive guardianship of the child. C.L. appeals from that judgment.

The underlying facts of this case,[1] as set forth previously by our Supreme Court, are as follows:

The adoptive child was born on December 12, 2004, in Cape Girardeau, Missouri. Father traveled from his home in Columbia to be present at the hospital, he participated in the birth of the child, and he stayed with mother and child until their release. However, only the mother's name was entered on the birth certificate; the father's name was entered as "unknown." On release from the hospital, mother placed the child in foster care for the purpose of adoption in Cape Girardeau, and father returned to Columbia. Then, on January 20, 2005, father, who had driven back to Cape Girardeau, and mother signed a "Reconsideration of Adoption Plan by Birth Parents" (although appellant wrote "not the father" after his signature), and they withdrew the child from foster care. Father and mother each paid half of the $300 cost of foster care. On that same day, father drove mother and child to Kansas City and placed the child in the home of another couple who were acquaintances of father. Although this placement was also made for the purpose of adoption, mother was given access to the child, and in the meantime,

1. We have adopted some of the factual information and analysis in this opinion from this court's opinion in *In re the Adoption of N.L.B.*, 274 S.W.3d 619, 623 (Mo.App.2009) (*N.L.B. 2* ) without citation to that opinion.

father returned to Columbia, though he remained in continual contact with the mother.

On February 15, 2005, M.T. and S.T., another couple with whom the child had been placed, filed a petition for transfer of custody and adoption of the minor child. At a hearing on February 25, the mother consented to the adoption and the court transferred custody to the petitioners. The petition stated that the father was "unknown;" father was never served with process. However, the night before, on February 24, father and mother had visited with the child, and the trial court found that father had actual notice of the hearing held the next day. Nonetheless, he did not attend.

On March 2, less than a week after the hearing, father now well aware that adoption proceedings had commenced, filed with the putative father registry pursuant to section 210.823, and mother signed the documents as well confirming that [C.L.] was the father. At approximately that same time, father and mother both signed a separate "acknowledgment of paternity form" pursuant to section 193.215. On March 4, an amended birth certificate was issued listing [C.L.] as the father. Then, on March 24, father sought leave to intervene in the adoption proceeding. Leave was granted on March 28. Father filed an answer on April 28 objecting to the adoption and to the termination of his parental rights. In the answer, he alleged that he was the natural father as conclusively shown by DNA testing, but stated he had not had sexual intercourse with mother in a manner that would have led to conception. On June 17, father next filed a separate "Petition of Declaration of Paternity." In response to these actions, M.T. and S.T. filed a second amended petition on June 23 expressly alleging that "the minor child was born out of wedlock to [mother] and [C.L.]" and that "the identity of the natural father is [C.L.]."

The trial was conducted on September 29 by a family court commissioner. The presentation of evidence was generally restricted to the issue of father's failure to file an action for paternity or file with the putative father registry within 15 days of the child's birth, which would obviate the need for his consent to the adoption under section 453.030.3. Although his actual paternity was not contested, father testified that his initial hesitancy in claiming paternity was due to his belief that his sexual relations with the mother could not have resulted in conception—that although he ejaculated, there was not sufficient penetration. He added that he now realized that there was sufficient penetration and conception did occur. Mother testified to the same effect, and added that she had had no sexual relation with any other person than father. At the conclusion of the trial, the commissioner entered findings and recommendations in favor of petitioners that were then incorporated in the judgment of adoption entered by the court.

*In re the Adoption of N.L.B.*, 212 S.W.3d 123, 124–25 (Mo. banc 2007) (*N.L.B. 1*).

The Supreme Court subsequently reversed the circuit court's decision, holding that "[t]he adoption statutes, properly interpreted . . . tacitly allow an unwed father in father's position to contest the adoption by presenting evidence of his parental fitness despite the fact that he did not fall within one of the three categories of fathers under section 453.030.3(2) from whom consent to an adoption must be given." *Id.* at 127. The court determined that the circuit court had, therefore, erred in limiting the evidence presented at trial

and "should instead have permitted all evidence pertaining to the ultimate and overriding ground for adoption required in section 453.030—'the welfare of the person sought to be adopted.'" *Id.* at 128.

On remand, the circuit court granted M.T. and S.T. leave to file a third amended petition on March 7, 2007. The case was eventually heard in seven days interspersed between September 14 and November 21, 2007. The court noted that the case had been remanded from the Supreme Court "with direction to the trial court to determine the 'unfitness' of [C.L.] in addition to the lack of statutory requirements of Section 453.030 RSMo." On December 28, 2007, the circuit court issued its judgment terminating C.L.'s parental rights and approving the adoption of N.L.B. by M.T. and S.T. In so doing, the court found that C.L. had "willfully, substantially and continuously failed and neglected to provide the child with necessary care and protection" during the six months immediately preceding the filing of the petition. Thereafter, C.L. appealed from that judgment to this court.

This court determined that C.L.'s consent for adoption was not required under section 453.030, RSMo Cum.Supp.2005, and that his constitutional rights were not violated "by the statutory scheme in place for adoptions because the statutory scheme afforded [C.L.] the opportunity to challenge the adoption and to be heard on the issue of parental fitness." *In re the Adoption of N.L.B.*, 274 S.W.3d 619, 623 (Mo.App.2009) (*N.L.B 2*). Further, this court noted that, to the extent the circuit court attempted to rely on facts prior to the previous trial to establish abuse or neglect, the Supreme Court already determined that the evidence did not support a finding of abandonment or substantial and continuous neglect under section 453.040(7) prior to the first trial. *Id.* at 624–25. The

Supreme Court held that the evidence presented at the first trial did not support a finding that any of the grounds contained in section 453.040 had been established. *Id.* at 625. This court found that, because the same evidence was presented in the second trial as was presented in the first trial on the issue of abandonment or neglect under section 453.040(7) and, because the Supreme Court found that evidence insufficient under section 453.040(7), it was likewise insufficient to establish abuse or neglect under section 211.447.5(2). *Id.* This court, therefore, concluded that the circuit court's findings were clearly erroneous because they were contrary to the Supreme Court's holding, which is the law of the case. *Id.*

Further, this court found that the circuit court's factual finding that C.L. had "'not pursued contact or requested visitation with the minor child until July 2007'" and that C.L.'s testimony "'that he does not now consent to the child being placed for adoption' was not credible" was not supported by the record. *Id.* at 626. This court also found that C.L.'s failure to pay child support while he appealed the circuit court's first judgment did not support the circuit court's finding that C.L. sufficiently neglected the child to warrant the consideration of termination of his parental rights under section 211.447.5(2). *Id.* This court said, "Regardless of whether [C.L.] had an obligation to pay child support while he was appealing the trial court's first judgment, ... he simply [could not] be deemed to have abused or neglected the child as provided in § 211.447.5(2) where he was actively fighting to regain the right and duty to provide care for his child." *Id.* Thus, this court concluded that the circuit court's judgment terminating C.L.'s parental rights for abuse and neglect under section 211.447.5(2) should be reversed because it was not supported by the record

and was against the weight of the evidence. *Id.* at 627.

However, in reversing the circuit court's judgment, this court noted that the circuit court "presumably chose not to make findings or conclusions on the issue of extraordinary or unusual circumstances because it was entering the permanent order of termination and adoption." *Id.* at 628. Thus, this court remanded the case to the circuit court "to consider whether extraordinary or unusual circumstances exist such that the well being of the child might require an award of custody to [M.T. and S.T.], or some other individual or agency, for such duration and upon such conditions as the court may deem appropriate." *Id.*

On remand, the circuit court held numerous hearings on this matter and determined that extraordinary and unusual circumstances did in fact exist and ordered that it was in the best interest of the child for M.T. and S.T. to receive guardianship of the child. C.L. appeals from that determination.

## ANALYSIS

Before addressing the merits of C.L.'s appeal, we note that M.T. and S.T. filed a motion to dismiss the appeal asserting that C.L.'s brief violates the briefing requirements of Rule 84.04. While C.L.'s brief has skirted many of the requirements of Rule 84.04 and, indeed, is not a model of clarity, this Court has, nevertheless, been able to discern most of C.L.'s points relied on and arguments. We, therefore, with a single exception, address the merits of C.L.'s points on appeal and deny M.T.'s and S.T.'s motion to dismiss.

 We do, however, find that C.L.'s briefing concerning the circuit court's alleged error in calculating C.L.'s child support obligation is woefully inadequate.

The circuit court ordered that C.L. pay $641.00 per month. In arguing that the circuit court's calculations are wrong, C.L. merely makes broad assertions that M.T.'s and S.T.'s calculations on its Form 14 were outdated and inaccurate and that no evidence established that he has ever been "under employed" or that he has hid income from the court. He also asserts that no reliable evidence was presented that would confirm the existence of or the amount of a trust fund that C.L. supposedly had at his disposal. In making his argument, C.L. cites to nothing in the record to support his allegation that the circuit court erred in calculating his child support obligation. Rule 84.04(i) requires that "[a]ll statements of fact and argument shall have specific page references to the legal file or transcript." Further, C.L.'s argument contains no citation to relevant authority, lacks any legal analysis, and is comprised mainly of unsupported conclusions. "Mere conclusions and the failure to develop an argument with support from legal authority preserve nothing for review." *Carlisle v. Rainbow Connection, Inc.,* 300 S.W.3d 583, 586 (Mo.App.2009). Moreover, C.L. failed to even provide the requisite "concise statement of the applicable standard of review" as required by Rule 84.04(e). We, therefore, deem this point abandoned.

Several of C.L.'s points relied on concern whether the circuit court erroneously granted the guardianship in this case. C.L. complains that the circuit court erred by applying "the welfare of the child test," by utilizing and finding that extraordinary and unusual circumstances warranted a guardianship, by forming a guardianship when M.T. and S.T. did not request a guardianship as an alternative to adoption, by basing its findings upon facts which the Family Court Commissioner found by do-

ing independent research,[2] and by placing the child with M.T. and S.T. when their actions caused the extraordinary and unusual circumstances.

■ In finding that a guardianship over the child was necessary, the circuit court relied on section 453.101, RSMo 2000, which says:

In the event that the juvenile court does not grant the adoption, the court may order that a guardian be appointed under the provisions of chapter 475, RSMo, to provide long-term care for the child. The order appointing the guardian shall specify the powers and duties of the guardian and the period of time the guardianship shall remain in effect with mandatory review by the court as provided in chapter 475, RSMo.

The provisions of chapter 475, to which section 453.101 refers, is section 475.030.4, which says:

Letters of guardianship of the person of a minor may be granted in the following cases:

(1) Where a minor has no parent living;

(2) Where the parents or the sole surviving parent of a minor are unwilling, unable or adjudged unfit to assume the duties of guardianship;

(3) Where the parents or the sole surviving parent have had their parental rights terminated under chapter 211, RSMo.

Thus, pursuant to section 475.030.4, the only subsection that the circuit court could have entered a guardianship over the child in this case would have been under subsection (2). Under this provision, "[a] natural parent has the benefit of a rebuttable presumption that he is the appropriate custodian, but the presumption may be overcome by evidence that a parent is unfit, unable or unwilling to take charge of the child." *Cotton v. Wise*, 977 S.W.2d 263, 264 (Mo. banc 1998). The circuit court, however, did not find that C.L. was unwilling, unable, or unfit to take charge of the child. It merely found that extraordinary and unusual circumstances existed in this case to award physical custody of the child to M.T. and S.T.

The Missouri Supreme Court has addressed the issue of whether a circuit court can bypass the provisions of Missouri's guardianship statute and grant custody and guardianship of a child to a person that the court's deem to be "a 'better' parent" when it is in the best interest of the child.[3] *Id.* at 263–64. In *Cotton*, the circuit court awarded custody and guardianship of the minor children to their older sister. *Id.* at 264. The circuit court concluded that the sister "may be awarded custody of the minor children, though [Father] is not unfit or unable to care for the minor children, if the minor children's growth and development may be detrimentally affected by placement with [Father] or by elimination of contact with [sister]." *Id.* The *Cotton* court concluded:

Although the trial court's recitation of facts following that statement is some proof that [Father] is unfit, unable, or unwilling to care for his children, the

---

2. The circuit court adopted the Family Court Commissioner's findings and recommendations.

3. The phrase "equitable parent" was used by the circuit court in the *Cotton* case. As explained by the *Cotton* court,

Under the version of "equitable parent" adopted by the trial court here, a "better"

parent simply could be substituted for the natural parent when that substitution seems to be in the best interests of the children. The phrase also implies that the non-parent is a "parent" and, thus, on equal footing with a natural parent.

977 S.W.2d at 264.

legal conclusion embedded in that statement is not correct. The award of custody to [sister] must be premised upon a finding that the natural parent is unfit, unable, or unwilling to care for his children.

*Id.* The Supreme Court emphatically found that "[u]nless a statutory scheme is plainly inadequate under circumstances where a court has a duty to act, there is no need for the court to exercise its equity powers to fashion a 'better' remedy than exists in the statutes." *Id.*[4]

■ Thus, to the extent that the circuit court established a guardianship over the child pursuant to section 453.101 based solely upon the best interests of the child, it was in error. Without a finding that C.L. was unwilling, unable, or unfit to take charge of the child, a guardianship is not appropriate in this case.[5] But, that is not the end of the issue in this case.

■ The courts of this state have recognized a judicially created exception to the presumption that granting custody to the natural parent will serve the best interest of the child.[6] *In the Interest of K.K.M.*, 647 S.W.2d 886, 890 (Mo.App. 1983). Under this exception, "the pre-

---

4. In *In the Interest of L.C.F.*, 987 S.W.2d 830, 835 (Mo.App.1999), this court was faced with this issue of whether the circuit court had to consider the natural parent's fitness, ability, and willingness to be the guardian of her children when faced with a petition to terminate the grandparents' guardianship over the children or if the circuit court could rely solely on the best interests of the children. Relying on the Supreme Court's decision in *Cotton*, this court found:

> Because the legislature has not authorized the probate division, under § 475.030, to grant custody based on a best interest[ of the child] analysis, but has limited the determination to that of a parent's fitness, ability and willingness to act as guardian, when faced with a motion to terminate letters of guardianship, the court's inquiry must stop when it ascertains that the child has a parent who is fit, able and willing to act as guardian.

*Id.* at 835 (citation omitted). The court noted, however, that "the inquiry into the parent's fitness, ability and willingness must be done bearing in mind Missouri's child welfare policy, which is for the State to act in the best interests of the child." *Id.* In *In re Schnieders*, 178 S.W.3d 632 (Mo.App.2005), this court recognized that, prior to 2001 the probate court was not directed to consider a minor's best interest in deciding whether to terminate a guardianship, but that in 2001 section 475.083 was amended and now says that a guardianship may be terminated " '[i]f the court finds that a parent is fit, suitable and able to assume the duties of guardianship and it is in the best interest of the minor that the

guardianship be terminated.' " *Id.* at 633–34. The *Schneiders* court, therefore, concluded that, although *L.C.F.* "correctly stated the law in 1999, it no longer applie[d] to [the] current understanding of the legislation." *Id.* at 634. Although the General Assembly amended section 475.083 to include "a best interest standard" in regard to terminating a guardianship, the General Assembly still has not amended section 475.030 to include "a best interest standard" in the formation of a guardianship. Thus, to that extent, *L.C.F.* remains instructive.

5. Because we reach the conclusion that a guardianship was not appropriate in this case, we need not address C.L.'s points as to whether the circuit court erred in applying the "welfare of the child test" in a guardianship case and whether the circuit court erred in forming a guardianship when M.T. and S.T. did not request a guardianship as an alternative to adoption.

6. In *Cotton*, the Missouri Supreme Court also recognized this judicially created exception, but the court determined that it was not necessary determine whether the judicially created special or extraordinary circumstances would be applicable to the guardianship statute in section 475.030. *Cotton*, 977 S.W.2d at 265. The Court said that, given the circumstance in the case, it would have been "extraordinary if the trial court were unable under the language of the current statute to make the optimal arrangements possible in this family's circumstances for the welfare of the children." *Id.*

sumption which favors vesting of custody in the natural parent must fall whenever the best interests of the child, for some special or extraordinary reason or circumstance, mandate that custody be vested in third persons, regardless of whether the evidence establishes the unfitness or incompetence of the natural parent." *Id.* Indeed, "[t]he child welfare policy of this state is what is in the best interests of the child." Section 1.092, RSMo 2000.

According to the *K.K.M.* court, the first reported decision in Missouri to address the issue of whether special factors other than the fitness or incompetence of the natural parent could be considered in determining the best interests of the child was *In the Matter of Scarritt*, 76 Mo. 565 (1882). *K.K.M.*, 647 S.W.2d at 890. In that case, the Missouri Supreme Court said:

> [I]it is the duty of the court to award the person of the infant to the custody of the father, unless it is made manifest to the court that the father, for some reason, is unfit or incompetent to take charge of it; or unless the welfare of the child itself, for some special or extraordinary reason, demands a different disposition of it, at the hands of the court.

*Scarritt*, 76 Mo. at 582. As the *K.K.M.* court points out, *Scarritt* establishes that "considerations other than parental unfitness and incompetence may be relevant in actions to determine the proper custodian of a child." [7] *K.K.M.*, 647 S.W.2d at 890.

Indeed, in remanding the case to the circuit court, this court instructed the circuit court to consider whether extraordinary or unusual circumstances existed such that the well being of the child would require "an award of custody to [M.T. and S.T.], or some other individual or agency, for such duration and upon such conditions as the court may deem appropriate." *N.L.B. 2*, 274 S.W.3d at 628. In making this decision, this court relied upon *In the Interest of Hill*, 937 S.W.2d 384 (Mo.App. 1997).[8] *N.L.B. 2*, 274 S.W.3d at 627–28.

In *Hill*, Father appealed the circuit court's placement of his son, born out of wedlock, in the custody of the mother's brother and sister-in-law under the supervision of the Division of Family Services ("DFS"). *Id.* at 385. The child was born September 5, 1991. *Id.* Mother left the child with her brother and sister-in-law in November 1991, and the juvenile court, upon a petition filed by the Juvenile Officer, subsequently awarded them custody under DFS supervision. *Id.* In November 1993, blood tests were performed, and Father was confirmed as the father of the child. *Id.* at 386. In April 1995, the court reviewed the matter again and continued the same custodial arrangement, but it granted Father weekly visitation and ordered him to pay child support beginning May 1, 1995. *Id.*

On September 22, 1995, when the child was four years old and had been in the continuous custody of Mother's brother and sister-in-law since November 1991, the court, after another hearing, ordered that the brother and sister-in-law retain custody, finding that special or extraordinary reasons required that placement. Father appealed. *Id.*

This court affirmed the juvenile court's decision. *Id.* at 385. In our analysis, we

---

7. For a more complete history of the "special and extraordinary'" exception, *see K.K.M.*, 647 S.W.2d at 890–92.

8. C.L. contends that the *Hill* case is not applicable because "the entire issue was based on a Chapter 211 case, which ... has different standards and statutory language." The *Hill* court, however, did not rely on statutory language to invoke the "special or extraordinary circumstances" exception.

recognized that "a parent's right to the custody of his or her child is controlling when it is consistent with the child's welfare, and presumptions do favor a parent's having custody of his or her child." *Id.* at 386. "Those presumptions are rebutted, however, when special and extraordinary reasons mandate that custody be granted to someone other than the parent for the child's well-being, regardless of whether or not the evidence establishes the unfitness of the natural parent." *Id.* This court found that substantial evidence supported the lower court's finding. *Id.* at 387. We noted that experts testified that the child had bonded strongly with the Mother's brother and sister-in-law and warned that removing him would be traumatic for the child. *Id.* Expert testimony also established that Father had not bonded with the child, that he indicated more concern for his rights than for the child's welfare, and that he "did not have a good understanding of child development and was unable to empathize with [the child's] emotions and needs." *Id.*

Ultimately, however, we emphasized that this was not a permanent placement. *Id.* at 388. We pointed out that DFS continued "to work with [Father] to unite him with his son," that he continued to have visitation rights, and that his parental rights had not been terminated. *Id.* We went on to state:

> [Father] may petition the court at any time to modify or to terminate the custody order. . . . This simply is not a case of the state's breaking the bonds of parent and child.
>
> . . . .
>
> . . . Unlike a termination order, a custody order is not irreversible and is subject to modification and termination.

*Id.* at 388. The facts in this case are exceedingly similar to the facts in *Hill.*

In this case, N.L.B was born on December 12, 2004, was placed in two different foster care placements, and was eventually placed with M.T. and S.T. on February 25, 2005. By the time the child was placed with M.T. and S.T., C.L. had denied numerous times that he was the father of the child. Once adoptive proceedings commenced, C.L. sought leave to intervene and filed results of a paternity test with the circuit court on April 28, 2005, that established that he was the father of N.L.B.

Once the Supreme Court reversed the circuit court's first attempt to terminate C.L.'s parental rights, C.L. began once weekly supervised visitations with the child in July 2007. The child was two-and-a-half years old at that time. Once the circuit court entered its second judgment terminating C.L.'s parental rights in December 2007, the visitations were stopped. At some point, M.T. and S.T. relocated to Texas. But, after this court reversed the circuit court's second termination judgment and remanded the case with directions, the circuit court again ordered a visitation schedule between C.L. and the child. More specifically, in May 2009, the circuit court ordered that two visits per month were to occur in Kansas City and two visits per month were to occur in Texas. C.L. did not attend any visitation in Texas. In October 2009, the circuit court entered a specific visitation schedule for the month of October, with two of the weekend visitations occurring in Texas. Again, C.L. did not attend the visitations in Texas.

Expert testimony established that the child is strongly bonded with M.T. and S.T. The experts agreed that this case was very unusual given the length of time that the child has been in M.T.'s and S.T.'s care and now the attempt to reunify the child with C.L. According to Roger Capshaw,

the parent-aid who supervised the visits between the child and C.L., the child believes that M.T. and S.T. are truly his parents, and Capshaw believes that introducing C.L. as his parent would be very confusing to the child at this point. Capshaw said that be believed it was important to have a therapist involved in the reunification process so that things would be explained to the child in the proper manner. According to Laura Greuner, a licensed clinical social worker, the child is very bonded to M.T.'s and S.T.'s family. The child sees himself as one of the siblings in the family and views M.T.'s and S.T.'s family as his family. Greuner said that it is in the child's best interest to be with M.T. and S.T. and to stay where he has known his entire life. She said that she did not believe it was in the child's best interest to spend part of his life with M.T. and S.T. and part of his life with C.L. Susan Peach, a licensed clinical social worker, said that the child has attachment skills and can learn to attach to and bond with other people, but Peach said that "it's going to be traumatic because it can't be in place of a primary attachment."

Maureen Patton, a licensed clinical social worker, also said that the child views M.T. and S.T. as his family. Patton says she has "concerns about [C.L.'s] understanding of [the child], his empathy in reference to [the child]," and his parenting skills. According to Patton,

> I'm particularly concerned about the emotional aspect, what I view as an absence of understanding about how information might impact [the child], what process [the child] may need to go through to assimilate information. I have concerns about whether or not [C.L.] is able to put [the child] first over his own desire to have people know that he is in fact the father and what I perceive as having people know that he

in fact is fighting a battle and intends to win the battle.

> I believe that [C.L.] plays with [the child] very much as a sibling, and I think that when he relates to him—my observation has been when he relates to him as a parent, it's in a fairly authoritarian manner that, you know, "We have to do this," or, "Now we're going to do this," or, "This is what's going to happen now," rather than any type of gentle redirection. And I think it demonstrates somewhat a lack of understanding about what [the child] needs and the fact that [the child] is going through quite a bit at this point in time and transition is more appropriate than just rushing things along.

> I've also—I also believe that [C.L.] hasn't had some very basic understandings about the child's educational and medical needs. Statements that he's had allergies for two—these allergies have been going on now for two years, allergies can go on for an entire lifetime and the—his frustration with that of, you know, why are we still dealing with allergies. The—his idea that [the child] would be possibly attending public school and going to kindergarten this August or September of 2009, when in fact he doesn't turn five until December and wouldn't even be accepted into kindergarten until next fall of 2010.

> Just some very basic, very basic things. And the focus of his energy has been to prepare his case, from my observation, rather than participate in co-operative efforts that might help [the child], that might help all of the adults. . . . .

> [E]mpathy is basically putting yourself in someone else's shoes. I've not heard those kinds of statements from [C.L.] about how [the child] might feel, about what [the child] might be experi-

encing. The twist is always, "What will people think of me?" referring to [C.L.]. "What will [the child] think of me if I don't fight this battle to regain custody of him?" You know, "People need to know that I'm his father."

It's a focus on [C.L.], rather than a focus on [the child], by his own statements.

. . . .

[S]ome of the statements that he's made [are] just really the primary adversarial focus of, you know, "This is what I think people are doing to me and I don't want this to happen this way."

Some lesser statements that, "This is what I think [M.T. and S.T.] do to him and I don't like this." Not a lot of thought, not a lot of planning about how [the child] might think about things. When we've tried to come up with plans about what it would look like if [the child] were placed here or placed there, [C.L.'s] plan was for [M.T. and S.T.] to have constant contact with him every day whenever they wanted. Whereas that may sound extremely generous on the surface, I'm not sure how that would be the best thing for a child who's trying to transition into a different household.

So there just doesn't seem to be an understanding or a thought of what [the child] would be going through. It's more a focus of what [C.L.] is going through and how things—how he looks to other people and how things look for him.

■ Based upon all of this evidence, substantial evidence supported the circuit court's finding that special and extraordinary circumstances exist in this case which makes temporarily placing the physical custody of the child with M.T. and S.T. appropriate. "[A] significant bonding familial custody relationship with third parties can constitute a special or extraordi-

nary reason or circumstance rendering it in a child's best interests to award third-party custody." *Flathers v. Flathers,* 948 S.W.2d 463, 470 (Mo.App.1997); *Hill,* 937 S.W.2d at 388. The circuit court, therefore, did not err in finding that extraordinary and unusual circumstances warranted its temporary placement of physical custody of the child to M.T. and S.T.

■ To the extent that C.L. asserts that M.T.'s and S.T.'s actions caused the extraordinary and unusual circumstances in this case, we are not persuaded. Although C.L. argues that M.T. and S.T. "are mentally and financially unstable, may have been abusive to the child, have fled the state without any notification to the Court or father, and have refused to comply with the children's division policies," the circuit court did not find such to be true. The circuit court is the arbiter of witness credibility, and we will defer to circuit court on questions of credibility of a witness and choosing between conflicting evidence. *Hill,* 937 S.W.2d at 388. Moreover, to the extent that C.L. contends that the circuit court erred in making certain findings of fact because the Family Court Commissioner conducted her own independent research in making those findings, his contention is without merit. The facts which C.L. complain about have no bearing on the special and extraordinary circumstances which warranted the circuit court's determination that physical custody of the child remain with M.T. and S.T.

■ Therefore, we conclude that, although the circuit court erred in the creation of a guardianship in favor of M.T. and S.T. over N.L.B., the circuit court did not err in maintaining N.L.B.'s placement with M.T. and S.T. as the extraordinary and unusual circumstances of this case as they existed at the time of the hearing

demanded it.[9] N.L.B. remains under the jurisdiction of the circuit court with legal custody and physical custody vested in the Children's Division for placement with M.T. and S.T. subject to visitation with C.L. as is consistent with the circuit court's directives. Reunification with C.L. is the permanency plan for N.L.B. and should be pursued deliberately consistent with the best interest of N.L.B. unless or until subsequent developments[10] justify a change in the permanency plan. This court is not unaware that reunification is dependent upon the continued efforts and progress of C.L. and that his actions (like refusing visitations in Texas) can impede reunification.

We find it necessary, however, to give these further directions to those involved in an effort to bring this saga to a conclusion. We find that N.L.B.'s continued absence from the territorial jurisdiction of the court is an impediment to his reunification with C.L. The court shall cure this impediment by having the child relocated as soon as practicable to the Kansas City area but no later than seven days after the end of the school year for the district in which N.L.B. resides.[11] Thereafter (assuming no major unforeseen subsequent developments justify a change in the permanency plan), the court shall bring all such assets as the court may have at its disposal to transition N.L.B. from his temporary placement into the home of C.L. as smoothly as possible but no later than the commencement of the school year for N.L.B.

Further, this court is aware that no amount of preparation will fully protect N.L.B. from the psychological trauma that will accompany any change in custody in this case. We trust, however, that the family court with the assistance of the professionals involved herein will endeavor to minimize it. We, therefore, reverse the circuit court's judgment establishing a guardianship but affirm the placement of N.L.B. with M.T. and S.T. as described above.

C.L. also complains that the circuit court erred in refusing to order the payment of fees and costs incurred by him on the previous appeal. C.L. contends that this Court in its mandate ordered M.T. and S.T. to pay C.L.'s costs that he incurred during the appeal. Although it is true that our mandate ordered M.T. and S.T. to pay C.L.'s costs that he incurred during the appeal, "[a]n allowance of 'costs' in an appellate court's mandate generally does not include attorney's fees." *Amburn v. Aldridge*, 296 S.W.3d 32, 34 (Mo. App.2009). The *Amburn* court, however, noted two exceptions to this general rule. "The first exception allows a trial court to award attorney's fees after appeal on a motion—filed prior to the appellate court's mandate—which the trial court holds in abeyance pending disposition of the appeal." *Id.* C.L. does not point to anything in the record that shows that he requested

9. This court is not oblivious to the demands of the Adoption and Safe Families Act of 1997 (ASFA) (codified as amended in various sections of 42 U.S.C.) that a permanent placement be pursued and that, although modifiable, a guardianship is considered permanent by ASFA.

10. The Missouri Supreme Court and this court have determined that no grounds presently exist to terminate C.L.'s parental rights. Those decision are the law of the case. That doctrine "provides that a previous holding in a case constitutes the law of the case and precludes relitigation of the issue on remand and subsequent appeal." *Walton v. City of Berkeley*, 223 S.W.3d 126, 128–29 (Mo. banc 2007) (citation and internal quotation marks omitted).

11. There is some indication in the record that N.L.B. may be home-schooled.

attorney's fees prior to our mandate. In fact he says that he submitted his affidavit as to fees and costs to the circuit court on November 2, 2009, which was almost nine months after this court issued its mandate. "The second exception ... allows circuit courts to hear untimely motions for attorney's fees where a party was prevented from making a timely request." *Id.* at 35. C.L. does not claim that he was prevented from making a timely request. Thus, to the extent that C.L. is claiming that the costs should include his attorney's fees, his contention is without merit. This court's mandate awarding C.L. his "costs and charges herein expended" did not include attorney's fees. In the absence of an award of attorney's fees in our mandate, the circuit court did not have the authority to consider C.L.'s request for attorney's fees. *Id.*

■ As to this Court's order of "costs and charges here in expended," the circuit court is obligated to follow this court's mandate. The circuit court has no authority to do other than was directed by the opinion and mandate of this court. *Morrison v. Caspersen,* 339 S.W.2d 790, 792 (Mo.1960); *see also Bennett v. Huwar,* 797 S.W.2d 512, 513 (Mo.App.1990). Thus, on remand, the circuit court shall award C.L. his costs associated with the previous case before this court.

■ Finally, C.L. asserts that the circuit court erred in allowing the child's name to be changed to the name that M.T. and S.T. call him, which also changed the child's last name to the same as M.T.'s and S.T.'s last name. We are unsure as to the circuit court's authority or even its reasoning for this change. While it is true that M.T. and S.T. pled in their petition for adoption that the child's name be changed, M.T. and S.T. have not adopted the child. Although the family court did have exclusive jurisdiction over the subject matter of the custody of N.L.B., it had no authority

over the subject matter of his name change. "Except in adoption cases, a change of name is not a subject matter dealt with in the juvenile code." *In the Interest of B— L— W— by Ellen K— v. Wollweber,* 823 S.W.2d 119, 122 (Mo.App. 1992). Given that reunification with C.L. is the permanency plan for N.L.B., we also do not believe that the name change is in the child's best interest.

## CONCLUSION

We reverse the circuit court's judgment establishing a guardianship but affirm the temporary placement of N.L.B. with M.T. and S.T. because the extraordinary and unusual circumstances of this case as they existed at the time of the hearing demand it. We remand the case to the circuit court with instructions that it take such action as is required to implement the instructions herein detailed with respect to N.L.B.'s placement and with respect to reunification with C.L. We also reverse the circuit court's judgment changing the name of the child. Finally, we remand the case to the circuit court for it to award C.L. his costs associated with the previous case before this court.

All concur.