**In the Interest of Julian HILL.**

**No. WD 51966.**

Missouri Court of Appeals,
Western District.

Jan. 21, 1997.

---

L.J. Buckner, Jr., Kansas City, for appellant.

Laurie Snell, Kansas City, for Juvenile Officer.

John McKay, Kansas City, for respondent.

SPINDEN, Judge.

Antonio C. Garrett appeals the circuit court's denial of his motion to rehear a dispositional order placing his minor son, born out of wedlock, in the custody of the boy's relatives under the supervision of the Division of Family Services (DFS). We affirm.

Garrett's son, Julian Hill, was born on September 5, 1991. In November 1991, the boy's mother, Sheena K. Hill, left Julian in the care of her brother and sister-in-law, Albert and Betty Hill. After a detention hearing in January 1992, the circuit court ordered placement of Julian in the Hills' custody under the supervision of DFS.

A few days later, the Jackson County juvenile officer filed a petition asking the circuit court to "enter such judgment as the Court shall find to be necessary in the best interests and welfare of [Julian] and the best interests of the State." The petition reported the father's identity as "unknown." Sheena Hill did not contest the petition. The court sustained the petition and ordered that Julian be placed in the Hills' custody under the supervision of DFS until further order of

the court. After reviewing the matter in April 1993, the circuit court ordered on May 26, 1993, that its order remain in full effect.

In the meantime, DFS identified Garrett as potentially the father. In May 1993, DFS asked Garrett for child support and for blood tests to verify paternity. In November 1993, blood test results indicated that the probability of Garrett's being Julian's father was 99.99 percent. In August 1994, the circuit court appointed an attorney for the father, and DFS began letting Garrett have supervised visits with the boy. After reviewing the matter again, the circuit court ordered in September 1994 and again in April 1995 that the previous order remain in full effect. The circuit court ordered Garrett to pay $150 per month in child support, beginning on May 1, 1995, and it ordered that Garrett be given weekly visits.

On September 22, 1995, the court found that "special or extraordinary reasons" mandated that the Hills retain custody. The circuit court scheduled a review of the order for September 1996. Garrett filed a motion for rehearing which the circuit court denied.

On appeal, Garrett complains that the circuit court's dispositional order of September 22, 1995, deprived him of his constitutionally-protected right to have care and custody of his child. He divides his argument into three subparts: (1) The circuit court did not require the juvenile officer to rebut the presumption in Missouri law that, as Julian's father, he was fit and competent to provide for Julian's care; (2) Missouri law wrongfully permits a child's "best interests" to outweigh *"per se"* his interests as the natural parent; and (3) the circuit court wrongfully applied recently-enacted legislation retrospectively to apply to him.

■ As to his first contention, a parent's right to the custody of his or her child is controlling when it is consistent with the child's welfare, and presumptions do favor a parent's having custody of his or her child. *In Interest of C.L.M.*, 625 S.W.2d 613, 617 (Mo. banc 1981). Those presumptions are rebutted, however, when special and extraordinary reasons mandate that custody be granted to someone other than the parent for the child's well-being, regardless of whether

or not the evidence establishes the unfitness of the natural parent. *In re Marriage of Carter*, 794 S.W.2d 321, 325 (Mo.App.1990); *C.M.W. v. C.W. and H.W.*, 786 S.W.2d 623, 624 (Mo.App.1990).

■ Although, the circuit court did not find Garrett unfit, it concluded that special and extraordinary reasons mandated placing Julian with the Hills under DFS' supervision:

... The child has lived virtually his entire life in the home of Albert and Betty Hill, who have nurtured him, cared for his every need on a daily basis and have provided him a wholesome and stimulating environment. He looks upon them as mother and father and in fact refers to them as "Mommy and Daddy", having been detained with them initially on January 22, 1992. But for the appearance of the father in his life in 1994 the child would have known only the Hills as his parents. The bond between him and the Hills, to the extent it has not been damaged by attempted reunification with his father (or "unification", since he has never lived with the father) is no less significant than that between any child raised in the home of his or her natural parents. The child is now four years of age.

... The Court finds, based on all the evidence presented, that placement with the father is not in the child's short or longterm interests. The Court finds that this result is dictated by the law, including, in part, Sections 1.092 and 211.011 RSMo., as it is refracted through the prism of the child's interests. While the father has engaged in various services, including family counseling and a plan of visitation, designed to strengthen his relationship with the child, such services cannot at this point in the child's life or the foreseeable future overcome the harm to the child in severing or weakening his close tie to the Hills. Dr. Douglas Martin, who counseling [sic] with Julian and his father, opined in his written report of April 15, 1995, that the child "would suffer emotionally and perhaps psychologically from the loss of that bond on a permanent basis." The court finds this continues to be true. The Court fur-

ther takes into consideration the testimony concerning the father's circumstances, including, among others, the father's conviction for a controlled substance offense in 1993 (when Julian was one and one-half years old), his failure to pay support until August, 1995, though ordered to do so commencing May 1, 1995, his lack of judgment in exposing the child to R-rated movies and the high probability that the child was exposed to matters of a sexual nature while on visits with the father. All the evidence taken as a whole depicts a child well-adjusted and functioning as an integral family member in the Hill household. To interrupt that placement, in light of the fatheris [sic] failure to timely assert a paternal interest in the child, would be to callously gamble with the well-being and longterm development of this child, which aleatory process the law does not, in the court's view, mandate in the present set of unique circumstances.

... The Court notes that the father cites *IN THE INTEREST OF FEEMSTER*, 751 S.W.2d 772 (Mo.App.1988) in his Hearing Brief, filed September 15, 1995. However, the court's review of that case reveals that it supports the judgment being entered herein in that it restates the previous rule of law that custody may be vested in a third party where the best interests of a child "for some special or extraordinary reason or circumstance mandate that custody be vested in third persons, regardless of whether the evidence established the unfitness or incompetence of the natural parent." For the reasons stated herein, the Court finds that such special or extraordinary reasons do exist in the case at bar.

Substantial evidence supported the circuit court's determination. The circuit court heard expert evidence that Julian had bonded strongly with the Hills. After living with them for nearly all of his life, he was very affectionate towards them and related to them as his parents. Experts warned that removing Julian from the Hills' custody would be traumatic for him. An expert told the circuit court that Julian had not bonded with Garrett, that Garrett had indicated more concern for his own rights rather than Julian's best interests, and that Garrett did not have a good understanding of child development and was unable to empathize with Julian's emotions and needs. Betty Hill testified that after Julian began visiting his father, he began wetting his bed, experiencing nightmares, displaying temper tantrums and enduring increased anxiety. She also indicated that once, after visiting his father, he acted out inappropriate sexual activity. Garrett admitted to the circuit court that he had permitted Julian to watch an R-rated movie. Betty Hill denied receiving any child support from Garrett.

In attacking the circuit court's findings of fact, Garrett first quarrels with the circuit court's statement that Garrett "fail[ed] to timely assert a paternal interest in the child." He responds:

... DFS records confirm that upon learning of [Julian's] birth one year after the fact, [Garrett] immediately began searching for his son to provide him care and custody.[1] ... When [Garrett] finally reached DFS caseworker, Steve Gibson, [Garrett] was bluntly and inappropriately told to "leave well enough alone."[2] ... [Garrett] later learned that DFS had been helping the Hills adopt [Julian].[3] ... Subsequently, after a year of trying to find [Julian], [Garrett] voluntarily submitted to

1. He cites a DFS record of telephone calls which reports that on November 30, 1993, Garrett indicated after paternity tests that he wanted custody of Julian. Garrett said he wanted to see Julian and that he tried to make contact with Julian but he always asked for the mother and not Julian when he contacted the mother's family. We find nothing in this record which proves his point that he was unaware of his son's birth for a year and began searching for him immediately on learning of his birth.

2. He cites the same statement made in his motion for rehearing which, in turn, cited attached exhibits for support. We find nothing in the exhibits which supports the allegation.

3. Garrett cites a DFS report dated June 8, 1993, indicating that Albert and Betty Hill had expressed an expectation of adopting Julian.

paternity testing of his own volition.[4]

Garrett excused his tardiness in asserting his role as Julian's father on his being unaware that his sexual relations with Sheena Hill had led to a child's birth. Garrett testified that he did not know that Sheena Hill had given birth to a child until sometime during the summer of 1993 when an acquaintance told him. He testified that he began searching for the boy but he could not find him.

Garrett also complains that the circuit court "relied heavily" on Betty Hill's testimony concerning Julian's behavioral problems after visits with Garrett. "Why the trial court chooses to ignore [Garrett's testimony that Julian had told him that Betty Hill had prompted Julian to say that he was having nightmares and a psychologist's testimony that his observations did not corroborate the Hills' report of Julian's bed wetting and having nightmares] is perplexing," Garrett says, "especially when [the psychologist] testified that he was never made aware of any problems in regard to exposure to sexual matters by the Hills."

■ The circuit court was the arbiter of witness credibility in choosing between Garrett's and Betty Hill's version of the facts. "This court will defer questions of credibility of a witness and choosing between conflicting evidence to the trial court[.]" *In Interest of B.A.F.*, 783 S.W.2d 932, 933 (Mo.App.1989).

The juvenile officer's evidence was sufficient to establish that special and extraordinary circumstances and Julian's best interests mandated placing Julian in the Hills' custody. The circuit court's order was supported by clear and convincing evidence.

■ Garrett also claims that the circuit court put Julian's interests above his fundamental interest as a natural parent, and this violated his constitutionally-protected due process rights. "No one knows," he argues, "if [Julian] will be better off with the Hills, not even the [circuit court]. Without increased visitation and continued observation, [the psychologist] could not properly assess the potential bonding between [Garrett] and his son."

DFS, however, continues to work with Garrett to unite him with his son. The circuit court did not terminate Garrett's parental rights, and he continues to have visitation rights. He may petition the court at any time to modify or to terminate the custody order. The circuit court heard evidence that Garrett has some ways to go before establishing the bond which typically occurs between father and son. This simply is not a case of the state's breaking the bonds of parent and child. We do not find any indication that the circuit court determined "*per se*" that Julian's interests outweighed any of Garrett's interests, as Garrett charges.

■ We, therefore, do not discern a due process violation. Missouri law provides adequate protection for parental interests implicated in custody cases because the parents may petition the court at any time to modify a custody order. Proceedings under § 211.181 are distinct from parental rights termination proceedings under § 211.447. Unlike a termination order, a custody order is not irreversible and is subject to modification and termination. *In Interest of D.D.H.*, 875 S.W.2d 184, 189 (Mo.App.1994). Having made this determination, we need not consider Garrett's notion that the circuit court wrongfully applied recently-enacted child welfare legislation retroactively to his case.

In his second point, Garrett complains that the circuit court improperly relied on his conviction for selling narcotics. He claims that this constituted impermissible reliance on a past condition and that he was entitled to custody of his son because he demonstrated that he had a steady job and was able to care for his other children.

■ We recognize that a parent's right to custody of his or her minor child is determined by existing conditions—past conditions are material only to the extent that they clarify and cast light on present conditions, *In Interest of Feemster*, 751 S.W.2d 772, 773

---

4. Again, Garrett cites his motion for rehearing in which he makes the same allegation. His motion for rehearing cited an exhibit showing laboratory test results, but we find nothing in the record indicating that Garrett submitted to testing "of his own volition." Nor do we find any support for the assertion that Garrett spent a year searching for his son.

(Mo.App.1988)—but we do not find that the circuit court improperly relied on past conditions. Although the circuit court's order made brief reference to Garrett's 1993 conviction for selling narcotics, the court considered several other factors in reaching its decision. The circuit court used the conviction—along with his failure to pay child support and showing the R-rated movie to Julian—to demonstrate Garrett's continuing problem with bad judgment. We find no indication that the court placed undue emphasis on the prior offense evidence.

■ Under this same point, Garrett claims that the circuit court violated his constitutional rights against double jeopardy because the court's considering his prior drug offense in determining custody effectively imposed "a second punishment" by denying him custody of his son. Garrett did not mention this claim in his point relied on; therefore, he is precluded from raising it in the argument portion of his brief. Moreover, the Supreme Court has instructed that a civil sanction based on a criminal conviction constitutes double jeopardy only when the civil sanction is imposed for purposes of retribution and deterrence as opposed to a remedial purpose. *State v. Mayo*, 915 S.W.2d 758, 760 (Mo. banc), *cert. denied*, —— U.S. ——, 117 S.Ct. 61, 136 L.Ed.2d 23 (1996). The circuit court's action was remedial—to protect Julian's welfare and best interests—and was not imposed for purposes of retribution. Double jeopardy has not been implicated.

■ In his final point, Garrett complains that the trial court did not determine whether removal of Julian was necessary to protect him as required by § 211.183, RSMo 1994. This point is meritless. Section 211.183 says:

1. In juvenile court proceedings regarding the *removal* of a child from his home, the order of disposition shall include a determination of whether the division of family services has made reasonable efforts to prevent or eliminate the need for *removal* of the child and, after *removal*, to make it possible for the child to return home.[5]

. . . .

---

**5.** We added the emphasis.

5. Before a child may be removed from the parent, guardian, or custodian of the child by order of a juvenile court . . . the court shall in its orders:

(1) State whether removal of the child is necessary to protect the child and the reasons therefor;

(2) Describe the services available to the family before removal of the child, including in-home services;

(3) Describe the efforts made to provide those services relevant to the needs of the family before the removal of the child;

(4) State why efforts made to provide family services described did not prevent removal of the child; and

(5) State whether efforts made to prevent removal of the child were reasonable, based upon the needs of the family and child.

This statute applies only when a child is *removed* from the home of a parent, guardian or custodian.

Julian has lived with the Hills almost all of his life. He never lived with his father. The state did not remove Julian from his father's home as contemplated by § 211.183. The circuit court, therefore, was not required to include findings as to whether removal was necessary to protect the child.

For these reasons, we affirm the circuit court's judgment.

SMART, P.J., and ELLIS, J., concur.