SHERRI B. SULLIVAN, J.
Introduction
K.M.M. (Kathleen) appeals from the trial court's order and judgment granting K.E.W.'s (Kate) Motion to Dismiss for Failure to State a Claim (Motion to Dismiss) two counts of Kathleen's petition, one seeking to establish her legal parentage of B.W. (Child) under Section 210.824[1] and one for breach of contract of a custody agreement, and in denying her claim for third-party custody or visitation pursuant to Section 452.375[2] after a trial. We affirm in part, reverse in part, and remand for further proceedings.
Factual and Procedural Background
Kathleen filed a petition seeking joint custody and visitation of Child based on *726 the parties' voluntary custody agreement (Count I), equitable parentage (Count II), third-party custody or visitation pursuant to Section 452.375.5(5)(a) (Count III), and her legal parentage pursuant to Section 210.824 (Count IV). Upon Kate's motion, the trial court dismissed Counts I, II, and IV for failure to state a claim and denied her claim for third-party custody or visitation pursuant to Count III.
In October 2007, Kathleen and Kate began a committed romantic relationship.[3] In the summer of 2008, Kathleen and her two children from a previous relationship, L.M. and E.M., moved into Kate's home.[4] In 2009, the parties opened a joint bank account to which they each contributed equally and from which they paid their shared expenses. In September 2009, the parties purchased a home together, where they lived with their children until the parties' separation in 2015.
At some point, the parties discussed and ultimately decided to have a child together, agreeing Kate would carry the child. In March 2011, the parties went to couples counseling to discuss their different parenting styles and how they would parent together.
In April 11, 2011, the parties executed documents with the Fertility and Reproductive Medicine Clinic related to the guidelines and consent to artificial insemination. This included a document titled "Patient Information and Guidelines[:] Artificial Insemination[,]" which stated, "Should a child be produced by this procedure, the responsibilities of the parent are the same as if the child were conceived by intercourse. The child shall be regarded as legitimate and entitled to all of the rights of support and inheritance as a naturally conceived child." Kate signed the line designated for the patient and Kathleen signed the line designated as "Partner[.]" They also executed a document titled "Consent to Artificial Insemination Using Sperm from an Independent Source[.]" Kate signed on the line designated for the patient and Kathleen signed the line designated "Spouse[,]" which she crossed out and replaced with "Partner[.]" The trial court found the execution of the documents evidenced a clear indication the parties knowingly entered into the process.
In order to become pregnant Kate had to undergo fertility treatments, and she became pregnant in October 2011 after the fifth insemination. The parties discussed and exchanged opinions about the prospective sperm donors.
Kate was insured under Kathleen's medical insurance as her "domestic partner," which partially paid for the cost of the fertility treatments, the artificial inseminations, and Kate's medical care during the pregnancy. Kate paid the uncovered costs of the artificial inseminations and each party made separate payments for the uncovered costs associated with Child's birth and related expenses.
Kathleen attended Kate's doctor visits and ultrasounds during the pregnancy. The trial court found the parties shared in the decision making and were excited with the anticipation of the conception, birthing, and parenting including participating in baby showers together, making a joint announcement *727 as a couple of Kate's pregnancy, and creating a joint baby registry. The record included cards from Kate to Kathleen stating Kate was excited to have a baby with Kathleen, Kathleen was going to make "a great mom to the new baby," and referring to them as a family.
On July 5, 2012, Kate gave birth to Child. Kathleen was the only non-medical person present in the delivery room. Kathleen cut the umbilical cord and stayed overnight in the hospital with Kate and Child. Kate picked Child's first name and Child's middle name was chosen in honor of Kathleen's grandfather. The parties sent out a joint email announcing Child's birth. Kate gave Kathleen a charm bracelet with Child's first initial.
After Child's birth, Kate took 12 weeks off work. Kathleen testified she took some days off but was unable to take maternity leave. Afterward, per the parties' agreement, Child attended daycare at a facility located on Kathleen's employer's campus. On the daycare enrollment forms, Kate identified herself and Kathleen as Child's mother, parent, or guardian, and L.M. and E.M. as Child's siblings.
The trial court found Kate was Child's primary caregiver but that Kathleen participated in the care, custody, and nurturing of Child. Kathleen assisted in putting Child to bed, getting Child up in the morning, changing his diaper, and dressing, feeding, and bathing him. Kathleen dropped off and picked up Child from daycare, took him to the pediatrician, stayed home with him when he was sick, and helped track Child's sleeping and feeding patterns. During the relationship, Kathleen carried health insurance for Child as her "domestic partner's child." Child's expenses, along with the rest of the family expenses, were paid from the parties' joint account. Kathleen read to Child, played with Child, would occasionally stop by daycare to see him during her lunch hour, and would take him with her when she went jogging. Initially, Child called Kathleen "mama" or "mommy" and Kate "mama" or "mom." As he got older, Child called them "Mommy Kathleen" and "Mommy Kate." Kate also called Kathleen "Mommy Kathleen." The trial court found the parties each participated in the care of Child "with the obvious maternalistic care [ ] that can be expected of the child's birth mother."
Kathleen testified she, Kate, and the children acted like a family-celebrating holidays and birthdays together, taking family vacations, having family photos taken, and taking care of each other. Kate created social media posts referring to herself, Kathleen, and the children as a "family." Kathleen testified she acted as a parent to Child and that Kate helped her parent L.M. and E.M. Kathleen testified she and Child were close and loved each other, and she wanted him to be safe and happy. Kathleen testified she and Child had a bonded relationship. Kathleen testified L.M. and E.M. loved Child. Kathleen submitted as evidence hundreds of photographs of herself, Kate, L.M., and E.M. with Child engaging in daily life and on special occasions.
At trial, Kate repeatedly denied she, Kathleen, and the children were a "family," instead classifying them as a household or a group of people who lived and "hung around" together. Kate testified she took on a stepmother-type role with L.M. and E.M. but asserted she was no more than their mother's girlfriend. Kate testified she and Kathleen did not equally share in the care of Child because Kathleen was not "around much" since she was traveling, working, exercising, and doing things for L.M. and E.M. During direct examination, Kate testified as follows:
*728 Q. Would you have had artificial insemination if you had not been in a committed relationship?
A. It's tough to say. You know, would I have ever? Probably.
[Guardian ad Litem]: Objection. Speculation.
THE COURT: Yeah. It's either a yes or no. As for [Child], I guess they're saying.
A. No, I probably wouldn't have done it completely on my own.
Q. (By Kate's counsel): Why not?
A. It seemed like a lot to take on by myself.
The trial court found that until the parties' separation, the parties held themselves out, acted, and operated as a family unit. The court found the "pregnancy, birth, child rearing and child care as performed by Kate and Kathleen as the actions of a 'family' as defined as those who love each other and protect and follow one another, but not with the adherence of legal status."
Kathleen's name does not appear on Child's birth certificate and she never adopted Child. At trial, Kathleen asserted Kate agreed she would adopt Child. Kate maintained Kathleen did not raise the issue of adoption until near the end of their relationship and that she never agreed to it. The trial court found Kathleen brought up the issue of adoption to Kate numerous times from Child's birth to the parties' separation and each time Kate deflected such discussions. The court found Kate's timing of leaving the relationship was at least partially driven by Kathleen's continued requests to adopt Child.
Over time, the parties' relationship deteriorated. On January 17, 2015, Kate moved Child's and her belongings out of the house while Kathleen was at dinner with her mother and the children. At that time, Kate told Kathleen via text message, "I don't want you to think it means I'm going to cut you off from seeing him. I'm not." Kate testified she believed at that time it might have been in Child's best interest to remain in contact with Kathleen. Kate subsequently switched Child's daycare. Shortly after the breakup, Kathleen asked Kate to work with her to set up a consistent visitation schedule. Kate initially agreed to allow Kathleen, L.M., and E.M. to continue to see Child and the parties arranged several visits.
On February 8, 2015, the parties met for a visit and then went to dinner. Kate testified Kathleen had previously asked Kate where she currently lived and about Child's daycare, and Kate told Kathleen she did not want her to know because she was afraid of Kathleen. At the dinner, E.M. asked Kate about Child's new school. When Kate appeared hesitant to answer, Kathleen whispered to Kate she knew where Kate lived and Child went to school, and she had not tried to "kidnap" Child and that Kate was fine. Kathleen testified she was attempting to reassure Kate she was not a threat to her or Child. Kate testified she perceived this to be a threat, in part because it was whispered to her and Kathleen appeared overly focused on Child during the visit. Kate testified the visit frightened her and so she made the decision to terminate contact between Kathleen and Child. In its judgment, the court acknowledged it did not witness the encounter firsthand but found nothing sinister in Kathleen's remarks.
On February 12, 2015, Kate and Kathleen met for coffee at which time Kate informed Kathleen she would never allow Kathleen or the other children to see Child again, and she would call the police and get a restraining order if Kathleen attempted to contact them.
*729 After this conversation, Kathleen had several interactions with Child. Kathleen suggested that three of these occasions were coincidental, such as seeing Child and Kate at a nearby park. On one occasion, Kathleen intentionally approached Child while he was playing outside at his new daycare. On another occasion, Kathleen appeared at Kate's brother's house and got out of her car and took a video. The court believed these intentional interactions could be seen as concerning or scary to Kate. David Clark, Ph.D. (Dr. Clark), an expert who performed a psychological evaluation of the parties, opined Kathleen did not understand boundaries. The court agreed with Dr. Clark's conclusion that Kathleen approaching Child at his daycare was an act of poor judgment but recognized Kathleen was grieving Child's loss after being abruptly cut off from him. Kathleen has not seen Child since April 2015.
The court found the relationship between the parties and the family unit became strained after Child's birth. Kate testified that after Child's birth, she observed Kathleen avoid the children by going to her room to sleep, sleeping on the family couch with her back to the family, and by spending time outside the house. Kate testified Kathleen would "ice out" Kate, L.M., and E.M. when she was angry or upset by ignoring them or withholding attention and affection and that she had begun to do this to Child. Kate testified she believed this amounted to psychological abuse. Kate testified the household was chaotic. Kathleen agreed the house was chaotic but not in a way that would put Child at risk.
The parties testified they had different parenting styles. Kathleen testified Kate is a good mother to Child and is not unfit. Kathleen testified Kate complained about her parenting of L.M. and E.M., specifically indicating Kathleen needed to be stricter with L.M. Kathleen testified L.M. was not an easy child to parent and discipline and that she had L.M. evaluated twice at Kate's behest during their relationship. Kathleen testified L.M. has since been reevaluated and received a diagnosis of Attention Deficit Hyperactivity Disorder. L.M. is not currently receiving counseling because his behavior has improved but has received it in the past and it is available to him in the future. Kathleen testified she has sought counseling, which includes discussions on how she can be a better parent.
Kate asserted the home environment presented an unsafe environment for Child, in particular L.M.'s conduct and Kathleen's parenting and alcohol use. Kate believed Kathleen was too passive and she should have been more active in parenting. Kate testified Kathleen would ignore L.M.'s behavior and then would explode in anger that was out of proportion. Kate testified these episodes would end with the whole house crying and Kathleen exiting the home. Kate testified she witnessed Kathleen drag L.M. through the house, throw him on a bed, and hold him up by his neck against the wall. While the trial court made no specific factual finding as to Kate's allegation, it did not find Kathleen was unsuitable to parent but instead concluded Kathleen was capable of being a good parent to Child. Furthermore, Dr. Clark found Kate's allegations regarding Kathleen's abuse and neglect of the children unsupported by collateral sources.
Kate testified she felt Kathleen's inadequate parenting of L.M. and E.M. and their behaviors toward Child were unsafe and dangerous. By way of example, Kate presented the court with a video of the children playing with Child when he was a baby to support her belief the play was too rough. The court, however, disagreed with Kate's assessment, believing the video evidenced *730 typical sibling behavior as opposed to a dangerous or unsafe situation. The court found no evidence L.M. and E.M.'s behaviors or Kathleen's parenting of them diminished Kathleen's ability to provide an adequate and stable environment for Child. The court also found Kate's stated concerns that L.M.'s teasing or "rough" play with Child rose to a dangerous level not supported by the evidence.
The court ordered the parties to be seen by Dr. Clark for a psychological evaluation. The initial purpose of the evaluation was to address Kate's accusations that Kathleen was emotionally unstable; was depressed and/or suicidal; displayed a pattern of out-of-control drinking, including drinking and driving with her children and attempting to do so with Child; is or has been a dysfunctional parent to the children; and has stalked Child. Dr. Clark diagnosed Kathleen with Major Depressive Disorder in Full Remission, finding no indication Kathleen's parenting competence was compromised by her depression or that it was necessary for her parenting time with Child to be restricted in any way due to the condition. Dr. Clark concluded Kathleen did not meet the diagnostic criteria for Alcohol Use Disorder as defined by the DSM-V and found no evidence alcohol impaired Kathleen's functioning in any areas of her life.
After Child's birth, Kate told Kathleen she did not want her to drink but Kathleen continued to do so. Kate asserted Kathleen came home intoxicated once or twice a week and would drink and drive both with and without the children in the car. Kathleen testified she made so many changes at Kate's request, she decided to pick her alcohol use as the one thing she would not change. Throughout trial, Kathleen maintained Kate exaggerated her alcohol use. Kathleen indicated she had never been told by anyone besides Kate that her drinking was a problem or that she needed help for her drinking. The court found this assertion was not necessarily true and believed the credible evidence was that alcohol was an issue in Kathleen's life. For example, the court noted Kathleen's inappropriate posting of photographs on social media featuring her children posing with alcohol; and two instances when Kathleen became so intoxicated she could not remember the previous day's events or did not know where she was. The trial court found the credible evidence indicated Kathleen's past alcohol use had occasionally hindered her ability to function and it was clear alcohol had been an issue in the parties' relationship, with Kathleen's alcohol use and alleged abuse a frequent subject of counseling and eventually leading to the breakup of the relationship. With regard to Kate's allegations Kathleen would drink and drive, the court found while there was some evidence to support this assertion, Kathleen denied driving drunk with her children and the court indicated it was not persuaded Kate was accurately reporting the events as they transpired.
For approximately eight months preceding the trial, at the suggestion of the Guardian ad Litem (GAL), Kathleen voluntarily participated in Soberlink, a program that monitors alcohol use by having the individual use a breathalyzer at regularly scheduled times. Four times a day, seven days a week, Kathleen blew into the breathalyzer which recorded her blood alcohol content (BAC) and took her photograph. Kathleen was not asked to abstain from alcohol during this period and testified she voluntarily participated in the program in an effort to prove her alcohol consumption was within normal limits and not the problematic condition described by Kate. While Kathleen did not abstain from alcohol, none of the results show she was *731 intoxicated during this period.[5] The Soberlink records indicate between October 28, 2015, and April 18, 2016, the device registered a BAC over .02% a total of ten times, the highest being .036%.
Kate claimed by December 2014 she became fearful of Kathleen and did not feel safe letting Child out of her sight. The court noted, however, Kate continued to permit Kathleen to regularly transport Child to and from daycare and to care for Child while she was not present. Kate also alleged she believed Kathleen began stalking her and Child after the separation. After the separation, Kate moved Child to a daycare close to Kathleen's home where Kathleen had sent her two other children; met with Kathleen alone; and visited her brother who lives near Kathleen, all of which the court found belied Kate's contention she feared for her safety. The court found Kathleen did not and does not pose any credible threat to Kate or Child.
Dr. Clark did not evaluate Child and had no opinion on the level of attachment or bonding between Child and Kathleen. Dr. Clark was critical of Kate's judgment in eliminating Kathleen, L.M., and E.M. from Child's life, opining that, even if all of Kate's allegations about Kathleen were true, it was not necessary to completely terminate all contact between Child and Kathleen to assure his safety.
Kate testified Child was more bonded to her than Kathleen during the relationship and, in her opinion, there was no attachment or bonding between Kathleen and Child as of the date of trial. Kate stated Child used to ask about Kathleen after the separation but this decreased over time and he does not ask about her anymore. During an evaluation in September 2015, Child referred to Kathleen as "mom" and stated Kathleen stayed at their old house because she had to watch L.M. and E.M.
Kathleen testified she and Child developed a bonded familial relationship during his first years and it was in Child's best interest to have custodial time with her and a sibling relationship with L.M. and E.M., as he did in the past. Kathleen requested the parties have joint legal and physical custody of Child and suggested there should be a transitional period for Child to be reintroduced into her life with the assistance of a therapist or counselor. Kathleen also suggested neither party use alcohol when they have custody of Child in order to remove that potential concern.
Kate requested Kathleen's action be dismissed as a violation of her parental rights and she retain sole legal and physical custody of Child.
The GAL recommended Kate have sole legal custody of Child due to the parties' inability to communicate and contentious relationship. He suggested the parties share joint physical custody and presented the court with two alternatives: (1) granting Kathleen 48-hour blocks of time, one each week on a two-week cycle, with the parties to work with a counselor to assist in the transition; or (2) two shorter, professionally supervised periods of time each week, such as two hours on Wednesday evening and eight hours on Saturday, with a reassessment after 90 days.
At the conclusion of the evidence, the court found there was a familial relationship but Kathleen had not rebutted Kate's presumptive parental authority or demonstrated it was in Child's best interest she be awarded any custody or visitation. Both Kathleen and the GAL filed motions requesting *732 the court to reconsider, which the court denied. This appeal follows.
Points on Appeal
In her first point on appeal, Kathleen argues the trial court erred in dismissing her claim to establish legal parentage under Section 210.824 because applying the statute only to marital children would violate the equal protection clauses of the United States and Missouri Constitutions, in that she alleged the parties complied with the essential requirements of Section 210.824 and the trial court excluded Child from the statute solely because of his parents' marital status.
In her second point on appeal, Kathleen contends the trial court erred in dismissing her claim for custody pursuant to the parties' custody agreement because voluntary agreements related to custody and support of children are enforceable in court, subject to the trial court's determination the arrangement serves the best interests of the children, and Kathleen alleged in her petition she and Kate voluntarily entered into a custody agreement regarding Child and the parties complied with that agreement until they separated and Kate stopped allowing Kathleen to see Child.
In her third point on appeal, Kathleen maintains the trial court erred in finding she is not entitled to custody or visitation as a third party pursuant to Section 452.375.5(5)(a) because the court did not properly weigh the bonded parent-child relationship between Kathleen and Child in determining Kathleen did not rebut Kate's parental presumption.
In her fourth point on appeal, Kathleen argues the trial court erred in finding she is not entitled to custody or visitation as a third party pursuant to Section 452.375.5(5)(a) because this determination is against the great weight of the evidence and is not supported by substantial evidence, in that the overwhelming evidence demonstrates Child's welfare and best interests require continued contact with Kathleen.
Standard of Review
Appellate review of a trial court's order to grant a motion to dismiss is de novo. Fenlon v. Union Elec. Co., 266 S.W.3d 852, 854 (Mo. App. E.D. 2008). A motion to dismiss for failure to state a claim only tests the adequacy of the plaintiff's petition. Id. All factual allegations contained in the petition are assumed to be true and this Court makes no attempt to weigh their credibility or persuasiveness. Id. The petition is reviewed to determine if the alleged facts set forth the elements of a recognized cause of action or of a cause that might be adopted in that case. Bosch v. St. Louis Healthcare Network, 41 S.W.3d 462, 463-64 (Mo. banc 2001). It is not the function of either the trial court or this Court to determine on the merits whether the plaintiff is entitled to relief. Fenlon, 266 S.W.3d at 854.
This Court will affirm the trial court's decision as to an award of child custody unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Flathers v. Flathers, 948 S.W.2d 463, 465 (Mo. App. W.D. 1997). A judgment is against the weight of the evidence when the appellate court firmly believes the judgment is wrong. Id."Weight of the evidence" refers not to the quantity or the amount of evidence but to its probative value. Id. The trial court has broad discretion in child custody matters, and this Court will affirm its decision unless we are firmly convinced that the welfare and best interests of the children requires otherwise. Id. The trial court is accorded greater deference in child custody *733 cases than other types of cases. Id. at 465-66.
Discussion
Point I-Section 210.824
Section 210.824, titled "Artificial insemination, consent required, duties of physician, effect of physician's failure to comply with law-inspection of records permitted, when" provides as follows:
1. If, under the supervision of a licensed physician and with the consent of her husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband is treated in law as if he were the natural father of a child thereby conceived. The husband's consent must be in writing and signed by him and his wife. The physician shall certify their signatures and the date of the insemination, and file the husband's consent with the bureau, where it shall be kept confidential and in a sealed file. The physician's failure to comply with this section shall not affect the father and child relationship. All papers and records pertaining to the insemination, whether part of the permanent record of a court or of a file held by the supervising physician or elsewhere, are subject to inspection only upon an order of the court for good cause shown.
2. The donor of semen provided to a licensed physician for use in artificial insemination of a married woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived.
Section 210.848 states, "Any interested party may bring an action to determine the existence or nonexistence of a mother and child relationship. Insofar as possible, the provisions of sections 210.817 to 210.852 applicable to the father and child relationship apply to the mother and child relationship."
In Count IV of her Petition, titled "Equal Protection[,]" Kathleen alleged she and Kate executed a Consent to Artificial Insemination agreement in accordance with Section 210.824 and summarily requested the court find Section 210.824 applied to women who consent to another woman's insemination; Section 210.824 is unconstitutional if not applied equally to unmarried same-sex couples pursuant to the equal protection clauses of the United States and Missouri Constitutions; and Kathleen is a parent of Child under Section 210.824 because the artificial insemination was done under the supervision of a licensed physician and with Kathleen's written consent.
Kate filed a Motion to Dismiss alleging Kathleen failed to state a claim upon which relief could be granted, asserting Kathleen failed to plead sufficient facts demonstrating an equal protection violation or supporting a finding she complied with the statute, in that she was not the spouse of the person artificially inseminated. The trial court granted Kate's motion.
On appeal, Kathleen asserts the court erred in dismissing her claim because the statute violates Child's right to equal protection by treating the children of marital and non-marital children differently.[6] This claim, however, is being raised for the first time on appeal and is not preserved.
There are stringent procedural requirements regarding the raising and preservation of constitutional issues.
*734 Beery v. Beery, 840 S.W.2d 244, 246 (Mo. App. E.D. 1992). For a constitutional issue to be preserved it must be raised at the first available opportunity. Id. If not raised at the first opportunity in the trial court, the constitutional claim is waived and cannot be raised on appeal. State v. Fassero, 256 S.W.3d 109, 117 (Mo. banc 2008).
Although Kathleen maintains the point on appeal is identical to that raised in her petition, this is inaccurate. In her petition, Kathleen asserts a constitutional violation of her own rights as an unmarried woman who consented to another's artificial insemination. Notably, statutory classifications based on marital status do not involve a suspect class or burden a fundamental right and, therefore, do not trigger heightened equal protection scrutiny. Glossip v. Missouri Dept. of Transp. & Highway Patrol Employees' Ret. Sys., 411 S.W.3d 796, 805 (Mo. banc 2013). Kathleen's brief, however, focuses almost entirely upon the statute's alleged disparate treatment between marital and non-marital children, arguing such laws are subject to heightened scrutiny. While Kathleen attempted to reframe her constitutional challenge in her reply brief, she failed to preserve her point by raising the specific constitutional challenge at the first available opportunity. Point I is denied.
Point II-Breach of Contract
Next, Kathleen contends the trial court erred in dismissing her petition for custody because she stated a claim to enforce a voluntary custody agreement between her and Kate.
In her petition, Kathleen alleged the parties entered into a voluntary custody agreement by agreeing to have a child together and equally share in parental responsibilities, obligations, and custody. Kathleen alleged the parties acted in accordance with the agreement from July 5, 2012, through January 17, 2015, by living together as a family in the same household with Kathleen assuming all the obligations of parenthood and by sharing the expenses related to the pregnancy and for Child's care, education, and development. Kathleen alleged Kate breached the parties' agreement by denying Kathleen contact with Child and noted Kate's refusal to agree to participate in mediation in order to establish a regular visitation schedule. Kathleen requested the court award her joint legal and physical custody and reasonable periods of visitation.
For a breach of contract claim, the plaintiff must allege facts demonstrating (1) the existence of a contract or agreement and the terms of that agreement; (2) plaintiff performed or tendered performance; (3) defendant's failure to perform; and (4) plaintiff's damages resulting from defendant's failure to perform. McGaw v. McGaw, 468 S.W.3d 435, 439 (Mo. App. W.D. 2015) ; White v. White, 293 S.W.3d 1, 23 (Mo. App. W.D. 2009) (overruled on other grounds as recognized by McGaw ).
Kathleen's petition failed to adequately plead a breach of contract theory. Kathleen made general allegations of an agreement to co-parent and share parental responsibilities and obligations. There are, however, innumerable custody and visitation schemes available and Kathleen failed to allege the specific terms of the parties' alleged custody agreement. The lack of defined contract terms is further evidenced by Kathleen's request not for enforcement of the specified terms of a contract, but for the court to award her joint legal and physical custody and "reasonable periods of visitation [.]" See McGaw, 468 S.W.3d at 440.
Kathleen failed to adequately plead a claim for breach of contract, and the trial court did not err in dismissing her breach *735 of contract claim for failure to state a claim upon which relief could be granted. Point II is denied.
Points III and IV-Third-Party Custody and Visitation Pursuant to Section 452.375
In her final two points on appeal, Kathleen challenges the trial court's denial of her request for third-party custody or visitation pursuant to Section 452.375.5(5)(a) based upon the trial court's finding she failed to demonstrate such an award would protect the welfare and best interests of Child. In her third point, Kathleen argues the trial court erred in finding she did not rebut Kate's parental presumption, in that the court improperly weighed the bonded parent-child relationship between Kathleen and Child in making its determination. In her fourth point, Kathleen argues the trial court's determination it was not in Child's best interest to award her custody or visitation is against the great weight of the evidence and is not supported by substantial evidence.
Rebutting the Parental Presumption
Section 452.375 provides in relevant part:
5. Prior to awarding the appropriate custody arrangement in the best interest of the child, the court shall consider each of the following as follows:
(1) Joint physical and joint legal custody to both parents, which shall not be denied solely for the reason that one parent opposes a joint physical and joint legal custody award. The residence of one of the parents shall be designated as the address of the child for mailing and educational purposes;
(2) Joint physical custody with one party granted sole legal custody. The residence of one of the parents shall be designated as the address of the child for mailing and educational purposes;
(3) Joint legal custody with one party granted sole physical custody;
(4) Sole custody to either parent; or
(5) Third-party custody or visitation:
(a) When the court finds that each parent is unfit, unsuitable, or unable to be a custodian, or the welfare of the child requires, and it is in the best interests of the child, then custody, temporary custody or visitation may be awarded to any other person or persons deemed by the court to be suitable and able to provide an adequate and stable environment for the child. Before the court awards custody, temporary custody or visitation to a third person under this subdivision, the court shall make that person a party to the action;
(b) Under the provisions of this subsection, any person may petition the court to intervene as a party in interest at any time as provided by supreme court rule.
(Emphasis added).
For several decades, it was generally recognized that a third party's standing to litigate custody or visitation pursuant to Section 452.375.5 was limited to situations where the third party was a named party to an action brought by someone else, was permitted to intervene in a pending action such as a dissolution, or already had custody other than de facto custody. White, 293 S.W.3d at 21. Third-party petitions and claims were routinely rejected based on lack of standing. Id. at 18-22 (review of cases analyzing whether the petitioner possessed or lacked standing).
The Missouri Supreme Court recently opened the courthouse doors in *736 In re T.Q.L., 386 S.W.3d 135, 140 (Mo. banc 2012), by holding third parties can maintain an independent action seeking custody or visitation pursuant to Section 452.375.5(5)(a). See McGaw, 468 S.W.3d at 444-46 ; and D.S.K. ex rel. J.J.K. v. D.L.T., 428 S.W.3d 655, 659-60 (Mo. App. W.D. 2013). While T.Q.L. represented a substantial shift in terms of standing, the opinion did not alter the existing law in the analysis of third-party claims.
The interest of a parent in the care, custody, and control of her child is one of the oldest fundamental liberty interests recognized as protected against government interference by the Fourteenth Amendment's due process clause. T.W. ex rel. R.W. v. T.H., 393 S.W.3d 144, 147-148 (Mo. App. E.D. 2013). "The law presumes that the best interests of the minor children are best served by the vesting of custody in the parent." In the Interest of K.K.M., 647 S.W.2d 886, 889 (Mo. App. E.D. 1983) (internal citations omitted). A natural parent's right to custody of their child is superior to that of third parties. Id."[N]atural parents are not to be denied custody of their minor children, unless the third party seeking custody first carries its burden of showing that each parent is unfit, unsuitable, or unable to have custody or that the welfare of the children requires it." Flathers, 948 S.W.2d at 466. Custody and visitation awards entered by the court are subject to future modification or termination. In the Interest of Hill, 937 S.W.2d 384, 388 (Mo. App. W.D. 1997).
Pursuant to Section 452.375.5(5)(a), a third party must demonstrate either that each parent is unfit, unsuitable, or unable to be a custodian or the welfare of the child requires, and it is in the best interests of the child to award custody to the third party. Further, the petitioner must prove "to be suitable and able to provide an adequate and stable environment for the child." Section 452.375.5(5)(a); T.Q.L., 386 S.W.3d at 139. The statute encompasses a rebuttable presumption that parents are fit, suitable, and able custodians of their children and a child's welfare is best served by awarding custody to their parents. Flathers, 948 S.W.2d at 466.
Under Section 452.375.5(5)(a), the court must first determine whether the third party seeking custody has rebutted the parental presumption via the "fitness" or the "welfare" bases. Flathers, 948 S.W.2d at 469. Only after the petitioner rebuts the parental presumption should the court examine the factors relevant to whether an award of third-party custody or visitation is in the child's best interest. Jones v. Jones, 10 S.W.3d 528, 535-36 (Mo. App. W.D. 1999). Kathleen acknowledges Kate is a fit parent, instead seeking relief solely on the basis of the welfare of Child.
To successfully rebut the parental presumption on the "welfare" basis, there must be proof of a special or extraordinary circumstance rendering it in the child's best interest to award custody to a third party. Flathers, 948 S.W.2d at 470 ; In the Interest of Hill, 937 S.W.2d at 386 ; Jones, 10 S.W.3d at 538 ; In the Interest of K.K.M., 647 S.W.2d at 890 ; In the Matter of Adoption of E.N.C., 458 S.W.3d 387, 400 (Mo. App. E.D. 2014). " '[A] significant bonding familial custody relationship with third parties can constitute a special or extraordinary reason or circumstance rendering it in a child's best interest to award third-party custody' under [Section] 452.375.5(5)(a)'s 'welfare of the child' prong." McGaw, 468 S.W.3d at 443, quoting Flathers, 948 S.W.2d at 470. See also Jones, 10 S.W.3d at 538 ; Matter of Adoption of E.N.C., 458 S.W.3d at 400.
Not every "third-party custodial relationship will automatically rebut the parental presumption rendering it in the *737 best interests of the child that third-party custody be awarded. Each case must turn on its own facts." Flathers, 948 S.W.2d at 470.
The court found the actions of Kathleen and Kate with regard to the pregnancy, birth, child rearing, and child care of Child to be the actions of a "family" as defined as those who love and protect each other. The court found Kathleen shared in nurturing and caring for Child, and was more than a caregiver or nanny but served "an emotional role in [Child's] life." While the court found there was a familial relationship, it found it was not significant enough to constitute a special or extraordinary reason or circumstance under the welfare basis. In doing so, however, the court improperly considered factors beyond those going to the familial relationship and looked to factors relevant to the best interest determination, the second step in the statutory analysis.
"Welfare" as used in Section 452.375.5(5)(a) is not the equivalent of "best interests," and each requires its own separate and distinct analysis and findings. See Jones, 10 S.W.3d at 535-36 ; T.W. ex rel. R.W., 393 S.W.3d at 150. Separating the "welfare" prong, and the related inquiry into whether a special or extraordinary circumstance exists, from the "best interests" prong is consistent with how the courts analyze third-party custody claims pursuant to the "fitness" basis under the same statutory provision. Under the "fitness" basis, the courts must first determine whether the parents are unfit and will only consider the child's best interest upon a finding of unfitness. Jones, 10 S.W.3d at 535-36 (best interest determination only reached if the parental presumption is rebutted under the fitness or welfare basis). While some of the factors relevant to these two determinations may overlap, they are considered independently and only when relevant to that particular determination.
In assessing Kathleen and Child's familial relationship, the court looked to the current level of conflict between the mothers; the parties' differing parenting styles; and Kathleen's alcohol use and mental state. While these types of factors could conceivably be relevant under a welfare analysis, there must be some indication they affected the bonded familial relationship. Here, there is no evidence or finding by the court these issues in any way affected Kathleen's ability to forge a bonded relationship with Child or vice versa. Instead, the court specifically found Kathleen was capable of being a good parent to Child and performing her function as a mother. The court found Kathleen treated Child as her own, shared in Child's daily care and nurturing, and fulfilled an emotional role in Child's life.
The evidence of a significant bonded familial custodial relationship between Kathleen and Child is overwhelming in both quantity and quality. The evidence is such that it leads to only one sensible conclusion: this was a family under every reasonable definition aside from legal. Prior to Child's birth, the parties lived together as a blended family encompassing Kate, Kathleen, and Kathleen's children. The parties were in a committed relationship, owned a home together, and commingled their finances. After several years together, the parties began discussing expanding their family to include another child. They sought preemptive counseling on their differing parenting styles before engaging professional medical services to assist them in reproduction through an anonymous sperm donor, one of the limited ways in which they were able to have a child together. Kathleen played an active role in planning the pregnancy and ensuring Kate and Child's care during the pregnancy.
*738 Kathleen was not confined to the waiting room with the extended family during Child's birth, but was the only non-medical person permitted to share and participate in the experience. After Child's birth, Kathleen shared in Child's everyday custody, care, and nurturing. Kathleen contributed to Child's financial needs equally. Kathleen acted as a parent to Child; L.M. and E.M. acted as his siblings; and Child referred to them respectively as his mommy, his brother, and his sister. Kathleen testified she and the children loved and cared for Child and formed bonded relationships with him. As the trial court noted, Kathleen acted "with the obvious maternalistic care [ ] that can be expected of the child's birth mother." The record is replete with evidence supporting a finding Kathleen and Child formed a significant bonded parent-child relationship while living together as a family.
Nothing in the record suggests Kathleen orchestrated or manipulated the situation to manufacture a special or extraordinary circumstance in order to gain custody or visitation of Child. Instead, all of the credible evidence demonstrates Kate desired and invited Kathleen to undertake an active parental role. By Kate's own admission, she would not have even had Child absent her relationship with Kathleen and the support and assistance Kathleen provided because she believed having and raising a child was too much to take on by herself. The court found from the time of Child's birth until the parties' separation, the parties and their children operated as and presented themselves to the outside world as a family unit. Before the parties' separation, Kathleen sought to formalize and legally protect the role she had been fulfilling for years. After their separation, Kathleen immediately requested to continue her parental role, seeking a formal visitation schedule and offering to pay child support. When Kate refused to accept financial support, Kathleen began contributing $800 a month to an account established under Child's name, accumulating $12,810 by the time of trial.
Throughout its judgment, the trial court acknowledged the somewhat murky state of the law under the "welfare" analysis and expressed its concern about identifying those persons who should be permitted to encroach upon another's parental rights to the custody and control of their children. The trial court's concern is justified and weighs heavily upon this Court as well; this Court does not enter into its decision lightly. As a matter of course, the parent-child relationship, revered both in life and law, is considered not just a "familial relationship" but one that is "significant" and "bonded." The significance of a bonded parent-child relationship is even more pronounced for minor children given the essential role parents or surrogate parents play in the care and nurturing of growing children. The question squarely before this Court is whether the dedicated, nurturing, and loving parent-child relationship between Kathleen and Child constitutes a "significant bonded familial custody relationship."
In this case, the record contains substantial and overwhelming evidence demonstrating Kathleen and Child had not just a parent-child relationship, but one that was significantly bonded. Having successfully proven a significant bonded familial custody relationship, Kathleen demonstrated the existence of a special or extraordinary circumstance and rebutted Kate's parental presumption which could warrant an award of third-party custody under Section 452.375.5(5)(a), provided such arrangement is in Child's best interest and Kathleen is found to be a suitable custodian who is able to provide a stable environment for Child. See T.Q.L., 386 S.W.3d at 139.
*739 Best Interests Determination
The trial court shall determine custody in accordance with the best interests of the child. Under Section 452.375.5(5)(a), the "welfare" prong and the "best-interest" prong require their own separate and distinct analysis and findings. Jones, 10 S.W.3d at 535-36. Section 452.375.2 provides the court consider all relevant factors including, but not limited to:
(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;
(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;
(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;
(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;
(5) The child's adjustment to the child's home, school, and community;
(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved ...;
(7) The intention of either parent to relocate the principal residence of the child; and
(8) The wishes of a child as to the child's custodian.
The trial court is required to look at all relevant factors, including those in Section 452.375.2, in deciding whether an award of third-party custody is in the child's best interests. Jones, 10 S.W.3d at 539-40. It is presumed the trial court properly considered these factors in making its decision. Id. at 540.
After finding Kathleen did not rebut Kate's presumption of parental authority, the court found the "best interest" standard was not met by Kathleen. In doing so, however, the court indicated it was not treating this case as a traditional "parental rights" case and instead looked to the best-interest factors set forth in Section 452.375.2 merely for "guidance." With regard to one of the statutory factors, Section 452.375.2(2), the court both failed to consider the needs of Child for a frequent, continuing, and meaningful relationship with both Kate and Kathleen and specifically indicated it was considering its finding Kathleen did not rebut Kate's parental presumption in assessing the parties' ability and willingness to actively perform their functions as parents. As already noted, however, the trial court erred in its findings under the welfare prong because Kathleen rebutted Kate's parental presumption by demonstrating she had a significant bonded parent-child relationship with Child. The trial court's subsequent misapplication of this finding necessarily tainted the court's best-interest determination, and the cause must be remanded for reconsideration of Child's best interests in light of this Court's findings.
The trial court misapplied the law by improperly combining the bonded parent-child relationship analysis with the best-interest analysis, failing to properly weigh the significant bonded parent-child relationship between Kathleen and Child as fostered by Kate against Kate's presumptive parental fitness, and by failing to properly apply the Section 452.375.2 statutory best-interest factors. The cause is remanded to the trial court for determination of whether Kathleen would be a suitable custodian who is able to provide a stable environment for Child and whether an award of custody or visitation to Kathleen would be in Child's best interests.
*740 Conclusion
The judgment of the trial court is affirmed in part, reversed in part, and the cause is remanded for proceedings consistent with this opinion.
Robert G. Dowd, Jr., P.J., and Kurt S. Odenwald, J., concur.

All statutory references are to RSMo Supp. 2012, unless otherwise indicated.

RSMo Supp. 2016.

The right of same-sex couples to marry was not recognized in Missouri at any time during the parties' relationship.

L.M. is Kathleen's biological child and E.M. is the biological child of Kathleen's former same-sex partner, Cynthia. During their relationship, Kathleen and Cynthia planned their pregnancies and adopted each other's biological children while living in Illinois. Kathleen and Cynthia entered into a voluntary joint physical custody agreement after their separation.

A person with a BAC of .08% is considered to be intoxicated. See Sections 577.012.1(1), 577.037.2 RSMo Supp. 2016.

The parties do not dispute that Section 210.824 applies equally to married same-sex and opposite-sex couples. Pavan v. Smith, 582 U.S. ----, 137 S.Ct. 2075, 198 L.Ed.2d 636 (2017).